The EAST 63RD STREET ASSOCIATION et al., Plaintiffs,

v.

William T. COLEMAN, Jr., as Secretary of Transportation, U. S. Department of Transportation, et al., Defendants.

No. 76 Civ. 2071.

United States District Court,
S. D. New York.

May 17, 1976.

Butzel & Kass, New York City, for plaintiffs; Albert K. Butzel, Peter J. Millock, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., S.D. N.Y., New York City, for Federal defendants; Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel.

W. Bernard Richland, Corp. Counsel of the City of New York, New York City, for Municipal defendants; Nina Gershon Goldstein, John C. Brennan, New York City, of counsel.

Stuart Riedel, Gen. Counsel, New York City Transit Authority, and Metropolitan Transit Authority, Brooklyn, N.Y., Gary Marcus, Brooklyn, N.Y., of counsel.

## OPINION

FRANKEL, District Judge.

The fashionable notion of "trade-offs," reflecting the pressures of a crowded world, describes aptly the often hard choices of policy and law affecting our environment. Those who govern the harried City of New York are commanded to discourage motor vehicle use and promote mass transit as one means of recapturing breatheable air for those who live and work here. Cf. *Friends of Earth v. Carey*, Docket No. 75–7497, 535 F.2d 165 (2d Cir. 1976).[1] But the blasting

---

1. See also the Urban Mass Transportation Act of 1964, § 2, and related enactments, 49 U.S.C. §§ 1601, 1601a, and 1601b.

of subway tunnels and the placement of subway stations produce temporary and permanent environmental impacts noisome to those in the vicinity. The case now before the court, brought on as a crisis, portrays the poignant clash of interests wholly worthy but not wholly reconcilable.

Plaintiffs are a group of relatively blessed people who live, in the words of one of them, among

"stately London plain [sic] trees, private brownstones and well-maintained, medium-sized cooperative and condominium buildings, as well as the First Church of Christ Scientist, at the Corner of 63rd and Park. These blocks are also rich in the history of New York as they contain the private homes of former Judge Seabury, in the courtyard of which Fiorello LaGuardia was inaugurated as Mayor of New York; the former unique architectural home of Gypsy Rose Lee, built by Lou Ziegfeld; the former home of George Kaufman, the playwright; and at East 63rd Street, the present home of Halston Frowick designed by the Architect, Paul Rudolf, which is the only new contemporary house built in the City of New York since 1948." [2]

Described more fully, plaintiffs include homeowners' associations on Manhattan's East 63d and East 62d Streets, a cooperative apartment corporation, a rental apartment building owner, and individual homeowners in the affected areas.

Defendants include as primary targets William T. Coleman, Jr., Robert E. Patricelli, and John Taylor, respectively Secretary of the Department of Transportation, and Administrator and Regional Administrator of the Department's Urban Mass Transit Administration, hereinafter sometimes referred to collectively as "DOT"; the Metropolitan Transportation Authority and the New York City Transit Authority; David L. Yunich, the Chairman of both those Authorities; Hugh Carey, the Governor of New York; Arthur Levitt, the State Controller; the City of New York and Abraham Beame, its Mayor.

The overall project to which the law suit relates is a new subway now in the process of construction from Northern Boulevard in Queens to Central Park South between Sixth and Seventh Avenues in Manhattan.[3] The particular focus of the present case is one of the three stations on that subway line, to be located between Third and Park Avenues on East 63d Street, with four entrances on the corners of 63d Street and Third Avenue and two entrances on the corners of 63d Street and Lexington Avenue.[4]

The gravamen of the complaint is that the "Environmental [Impact] Statement" (EIS) of the DOT, relating to the whole subway project, was fatally deficient with respect to the construction and effects of the East 63d Street Station, and that work on the station, which has now begun, should be enjoined pending correction of that wrong. The complaints against the EIS are arguments of substance in at least some respects, and they have been weighed with the care allowed by the emergency scheduling of this proceeding. It is important, too, that the EIS was issued in April 1973, and this action was not begun until May 7, 1976. Plaintiffs have defenses against the charge of laches, but not enough, as will appear, to obliterate that as a factor adverse to the motion now before the court for a preliminary injunction.

The motion came on by order to show cause on May 7, 1976, when the action was filed. Upon the return day, May 12, after oral argument, the court temporarily restrained work on the station except for completion that day of some test holes (with plaintiffs' consent). Today, upon findings and conclusions which follow, the

---

**2.** Affidavit of Lawrence P. J. Bonaguidi, President of the East Sixty Third Street Association, sworn May 6, 1976, at 2.

**3.** The line passes westerly under part of Queens, the East River, East 63d Street, and a corner of Central Park, to connect with existing subway lines on Sixth and Seventh Avenues.

**4.** The Transit Authority plans to set these entrances inside building structures, and has acquired property rights for this purpose.

restraint will be vacated and the motion for a preliminary injunction denied.

## I.

The pertinent facts are, with minor exceptions to be noted, undisputed. As the complaint alleges, and the EIS documents, the idea of building the new subway line was adopted by the Transit Authority in the early 1960's, and the location of the station in question was determined by December 1970.[5] Construction of the line has been approved by the New York State Legislature and Governor, as well as by New York City's Board of Estimate, City Council, and Mayor.

In or before 1972 the New York City Transit Authority filed an application for federal capital grant assistance under the Urban Mass Transportation Act of 1964, 49 U.S.C. §§ 1601 *et seq.* (1970), to obtain a substantial portion of the projected cost of the line. It is not disputed that the granting of federal funds to assist the financing of the line constituted, in the language of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4331 *et seq.* (1970), "major Federal action significantly affecting the quality of the human environment." Accordingly, the EIS was prepared, circulated, and adopted as of April 16, 1973. The EIS announces that "[i]t is the result of studies conducted by the New York City Transit Authority," reviewed by the proper federal authorities, and "takes into account" the results of a public hearing held by the Transit Authority on November 20, 1972. The speakers at that public hearing included representatives of the City of New York, of various Community Boards and Planning Boards, and of the Sierra Club. As stated in the EIS, "[n]o speaker appeared in opposition to the Project. The only objection voiced at the hearing was to the acquisition of one of the properties required for the Project." Although there were various suggestions for changes of detail, the speakers were uniformly positive about the environmental advantages of building the subway line. Constantine Sidamon-Eristoff, the Transportation Administrator of the City of New York, said:

"When completed, the impact of the program will not only be measured in terms of better transportation but also in terms of an improved environment, as auto users are provided an alternative, attractive means of commuting."

A speaker for the Sierra Club endorsed "without reservation the increased use and extensions of mass transit in our city," stipulating that stations should be placed to have "maximum feasible utility" for residents and users and should be constructed with due concern for "human amenities" for the users.

Complaining at this much later date, the plaintiffs before us agree that the overall effects of the new subway line will be environmentally beneficial. Though they object, somewhat weakly, to its location and design, their main attack is upon the environmental impacts they will suffer while the East 63d Street Station is being built. Their legal target is the EIS, said to have been critically deficient in this aspect. Stated fully in plaintiffs' words (Complaint ¶ 43), the inadequacies of the EIS included, "among other things:"

"A. The EIS did not and does not describe the extent of excavation required for the 63d Street Station or the environmental impacts of such excavation and other related construction.

"B. The EIS did not and does not mention, much less analyze, the resulting visual blight, traffic congestion, air and noise pollution and similar impacts upon the residents of 63rd Street.

"C. The EIS did not and does not consider in any meaningful way (and, indeed, does not mention) alternatives to the 63rd Street Station, including possible alternative locations, reductions in the size thereof, reductions in the number of entrances, or alternative construction plans

---

5. The other two stations are located on Roosevelt Island in the East River and at 21st Street in Queens.

that could mitigate the adverse environmental impacts.

"D. The EIS did not and does not disclose the numbers of riders that would be expected to use 63rd Street Station upon its completion, or the resulting impacts on the residential neighborhoods in the vicinity of the Station.

"E. The EIS did not and does not mention, much less consider, the urban impacts, including possible increases in crime and heightened security problems, that might follow from the location and operation of the 63rd Street Station." [6]

Omitting here the details of the several claims and prayers for relief, we deal with a motion to enjoin defendants preliminarily "from further proceeding with any action in furtherance of the construction of the subway station * * * or in furtherance of any activities related thereto which involve the cutting or removal of trees on or the excavation or other construction activities in 63rd Street between Park Avenue and Third Avenue, in Park, Lexington and Third Avenues in the vicinity of 63rd Street or on the adjacent sidewalks of such streets and avenues, or affecting the buildings and structures on such streets and avenues in such vicinity."

## II.

■ Our starting point is plaintiffs' critique of the EIS. The principles governing this subject, though recent, are now familiar. The complaint and the EIS are to be tested by a standard which requires, not perfection, *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123 (5th Cir. 1974), but that the appropriate federal agency has gone through a process of "individualized consideration and balancing of factors—conducted fully and in good faith * * *." *Calvert Cliffs Coordinating Comm., Inc. v. Atomic Energy Comm.*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).[7] Plaintiffs' objections have been appraised in that light, and are treated here in the language of their complaint and order of their presentation.

"A. The EIS did not and does not describe the extent of excavation required for the 63d Street Station or the environmental impacts of such excavation and other related construction."

and

"B. The EIS did not and does not mention, much less analyze, the resulting visual blight, traffic congestion, air and noise pollution and similar impacts upon the residents of 63rd Street."

These first propositions are plaintiffs' most persuasive ones. They appear upon analysis, however, to be insufficient in themselves, and more clearly insufficient in the setting of the case as a whole, to warrant the extraordinary relief plaintiffs seek.

■ As to the setting, it must be remembered that we deal with an EIS assessing, as it was required to do, the entire subway line, of which the East 63d Street Station is an interlocked component. It is of at least passing interest that neither the EIS as a whole nor any other segment has generated environmental attacks by anyone in the three years since its promulgation. More importantly for now, the judgments for the line as a whole, including the relatively temporary environmental impacts of constructing the segments,[8] must be borne in

---

[6]. The complaint also asserts (¶¶ 46–48) that the EIS is deficient because "DOT did not really prepare the EIS. Instead, it adopted the Transit Authority's environmental assessment as the principal body of the EIS." This is alleged to be improper because the "EIS is required to be prepared by the responsible Federal official," and, while "an EIS may now be prepared by a responsible *State* agency or official," the Transit Authority "is not a State agency and does not have statewide jurisdiction."

[7]. This review is procedural; NEPA requires that environmental factors be explored prior to a

decision, not that a particular decision be reached, *Scenic Hudson Preserv. Conf. v. Federal Power Comm.*, 453 F.2d 463, 467–69 (2d Cir. 1971).

[8]. The reference to "relatively temporary" impacts is not meant to depreciate the seriousness of the expected discomforts and annoyances that bring plaintiffs to the court. The subject remains, however, an obvious occasion for balancing—primarily by administrative officers, but even by the courts in their limited assignments.

mind in appraising complaints that one factor or another was insufficiently stated or omitted altogether.

Extracting only the portions relating to the expected impacts of the station's construction process, the EIS said, *inter alia*:

"The cut-and-cover method will be used for constructing station mezzanines and appurtenant structures (which are close to the street surface) and for constructing the portions of structure where the rock cover is insufficient for tunneling. Cut-and-cover construction will be required * * * in the station area in the vicinity of Third-Lexington Avenues in Manhattan. Requisite decking will be placed during off-peak hours. Sufficient traffic capacity will be maintained along all vehicular arteries, at all times. Pedestrian traffic access to buildings and places of business will likewise be maintained." (P. 29.)

"1. There will be temporary disruption of traffic and utilities, traffic congestion, community service disruptions, as well as, construction noises, dusts, solid wastes and spoil disposals.

"2. NYCTA [New York City Transit Authority] will administer a program to reduce temporary adverse effects during construction to a minimum. The Author-

ity will conform to all established criteria set by the governmental agencies and their consultants." (Summary Sheet.)

"The short-term construction effects on the environment are obvious. There will be construction noise, some dust, interference with vehicle and pedestrian traffic, and a negative visual impact at construction sites. These conditions will last only while construction is taking place. The duration of construction will vary depending on the size of individual construction contracts." (P. 40.) [9]

This was grossly inadequate, plaintiffs say, because the extent of cut-and-cover work [10] was not revealed; the intention to remove all of the trees during the construction process was not mentioned; the continuing excavation after completion of the cut-and-cover work, with associated blasting, was not discussed; the erection of a large elevator between Park and Lexington Avenue, to be "used for heavy trucks that will carry the excavated wastes away", was not revealed; and the environmental assaults during the construction process (such as the noise of trucks, air pollution, traffic congestion, and the general visual unattractiveness) were not detailed. Additionally, plaintiffs continue, they were misled, in private meetings with Transit Authority officials, as to how the work would be accomplished.[11] These arguments are discovered

---

9. The above quotations are not exhaustive of the pertinent passages in the EIS. There are more detailed discussions of "Effect on Traffic" (pp. 82–83), "Construction Noise" (pp. 85–86A) and "Dust Control" (p. 87). Other statements similar to those quoted also occur at various places. With respect to cut-and-cover construction, see p. 43; with respect to general construction effects, see pp. 29, 40, 44, 76–77.

10. "Cut-and-cover" work "entails digging a trench the width and depth of the proposed structure, covering the excavation, then building the subway structure in the newly formed excavation and backfilling the balance of the excavation and restoring surrounding surfaces." Affidavit of Colonel John T. O'Neill, sworn May 11, 1976, at 5. With respect to the cut-and-cover work proposed in connection with the 63d Street Station, the excavation will take place along a trench some 100 feet in length, and approximately one-half the street's width. Each successive section will be excavated and

decked before moving to the following location. *Id.* at 6.

11. One such meeting was held on November 17, 1970, where, plaintiffs assert "nothing was said" about the elevator shaft and "nothing whatsoever was stated with respect to the amount or degree of open and surface disruption." Affidavit of Lawrence P. J. Bonaguidi, dated May 6, 1976, at 3. This meeting, it is noted, occurred some 2½ years prior to the promulgation of the EIS, and before federal funding had even apparently been requested. At a second meeting, on November 29, 1972, Transit Authority officials "showed large diagrams to the assembled membership which showed cut and cover selection only at the corners of Third Avenue and Lexington and at the corners of Third Avenue and extending into the block between Lexington and Third only about 30 to 50 feet. The shaded area was specifically and orally represented at the meeting as being the only cut and cover that would be involved." *Id.* at 3.

to have serious inadequacies on grounds of both fact and law.

■ In November 1972, five months before the EIS's promulgation, there was explicit notice of the indicated extent of cut-and-cover work. The public hearing at which the notice was given is an integral part of the procedures and consideration prescribed for mass transit financing to which the EIS is related, see 49 U.S.C. § 1602(d), and which this court must consider in appraising any alleged NEPA deficiency. The EIS reflected the relationship by express reference to the public hearing. "The law is clear that in judging an agency's compliance with NEPA, the Court must consider all of the requirements of NEPA and not just the sufficiency of the EIS." *Inman Park Restoration, Inc. v. Urban Mass Transportation Admin.,* 414 F.Supp. 99 (N.D.Ga.1975). See also *Environmental Defense Fund v. Corps of Engineers,* 492 F.2d 1123, 1137–38 (5th Cir. 1974). At the public meeting, in plaintiffs' neighborhood,[12] it was stated, and illustrated by a chart with the affected areas marked in yellow, that the cut-and-cover procedures would extend through some 730 feet out of a final total of 920 feet, or approximately 80% of the East 63d Street stretch that will be so constructed. The responsible representative of the Transit Authority who spoke at the meeting, Colonel John T. O'Neill, the Executive Officer for Construction Administration and Chief Engineer of the Authority, said:

"The project in Manhattan will be constructed by rock tunneling methods, except in the area of the station in the vicinity of Third and Lexington Avenues. In this area construction will be by cut-and-cover method as shown in yellow."

In this context, it is clear that the EIS statements that the cut-and-cover method would be required "in the station area in the vicinity of Third-Lexington Avenues" and would "be used for constructing station mezzanines and appurtenant structures," were not misleading or deficient at all, but were as accurate as might be expected as of mid-1973 when, as the EIS noted, "[d]esign and construction methods for the Project [had] not been finalized."

Plaintiffs are not helped now to block the work by their prime reliance upon private audiences with Transit Authority officials, most particularly on November 29, 1972, at which they say they were given a different description of the extent and nature of the cut-and-cover operations and other procedures. The significance of such meetings and the nature of the statements made are disputed by defendants. There is no necessity, however, to resolve the apparent disputes for purposes of this emergency proceeding. Nobody intimates that the Secretary of Transportation or other federal officials whose EIS is assailed were identified or otherwise involved with (or even notified of) these informal, local, nonstatutory consultations. There is no intimation why federal authorities should have been required to spell out again in their EIS the details of construction which (a) had been publicly announced at the statutorily required meeting, and (b) were not, in any event, reduced to final plans and specifications at the time when the decision to give federal funding had to be made. The level of expected or required detail is controlled, at least in part, by the requisites of timing the EIS, having in mind that a statement must often be prepared (as this one was) when many specifics of a project remain to be evolved. See *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927, 935 (2d Cir. 1974), vacated and remanded, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Inman Park Restoration, Inc. v. Urban Mass Transportation Admin., supra,* 414 F.Supp. at 117. Sufficient warning of extensive cut-and-cover construction in the vicinity of the station was given; the precision of hindsight should not require more.

12. The meeting was held at Hunter College Playhouse, at Park Avenue and East 68th Street, in Manhattan.

While the construction impacts, however unpleasant, will be temporary, the EIS did not fail 'to attend to the problem. There was significant attention—in the EIS itself, in the underlying and related public hearing, and in actions taken during the intervening years—to the extensive measures to be taken for minimization of the adverse effects of the construction process, including cut-and-cover work. The Transit Authority agreed to "administer a program to reduce temporary adverse effects during construction to a minimum." This included conforming "to all established ordinances, codes, standards and criteria." These standards, which all seem to agree are more stringent in New York City than in almost any other place, are described in some detail in the EIS. Beyond their undertaking to comply with applicable laws and regulations, defendants detail further, and substantial, changes in normal construction procedures that have been undertaken to control and limit the unpleasantness of the construction period. Plaintiffs "do not question that such [minimization] efforts have been made or that some lessening of effects has resulted," but argue that the remaining impacts "are extremely severe."[13] The more significant thought on balance, when weighed with the other circumstances, is the lessened justification for injunctive relief "where extensive and thoughtful consideration [has] been given to mitigating the adverse environmental consequences of the project," *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* 508 F.2d at 937.[14].

The debate over the nature of the impacts of the station construction descends, after all, to matters of comparative detail upon which the EIS was not required, and should not have been expected, to elaborate. The basic kinds of unpleasantness, even potential misery, for the residents during the period of construction were adequately stated and included in the reckoning. Some things are evident to all the world, including drafters of EISs and even judges. The particulars plaintiffs now seem to find critical were in fact embraced by the references in the EIS to "temporary disruption of traffic and utilities, traffic congestion, community service disruptions, as well as, construction noises, dusts, solid wastes and spoil disposals," and the "negative visual impact" at construction sites. It is not easy to imagine what else that might have been said would have added to the vivid image those phrases give of construction disruptions. Indeed, plaintiffs' papers are scarcely more concrete, concluding, much as did the EIS, with general references to "heavy construction work and all its associated indignities."

The makeweight character of the details plaintiffs retrospectively demand is underscored by the length of time it has taken them to come here. While this goes mainly to laches, it bears mention that plaintiffs, like all of us, could have observed three years ago the absence of detail they now assert as a glaring defect. If such items were really deemed vital to them, the demand could have been made, and satisfied, long ago. It appears in fact that while plaintiffs now wish earnestly to block the unpleasant construction work on their block, their troubles are not fairly attributable to an inadequate EIS or fairly curable by holding that document unlawful. This singular theory for blocking the construction in not a valid one.

13. Affidavit of Albert K. Butzel, Esq., sworn May 13, 1976, at 2.

14. Plaintiffs' concern for the temporary or permanent loss of trees is genuinely moving, but not a powerful argument in the case. The trees are to be replaced as nearly as may be. The contractor has bound itself to supply a couple of dozen in movable holders as temporary amenities during the construction work. A number of those now in place have been found to be diseased. When the work is completed, there will be about as many trees as there are now, if probably less stately and smaller.

"C. The EIS did not and does not consider in any meaningful way (and, indeed, does not mention) alternatives to the 63rd Street Station, including possible alternative locations, reductions in the size thereof, reductions in the number of entrances, or alternative construction plans that could mitigate the adverse environmental impacts."

Plaintiffs not only admit that their real arguments in this case concern the methods of construction of the station; they acknowledge that they were willing to accept the building and later existence of the station until they learned the extent of disruption that would occur during the construction.[15] Their reliance on asserted deficiencies in the EIS for purposes of this motion, however, extends beyond the effects of the construction process to include issues associated with the station's location The asserted defect of inattention in the EIS to alternative locations for the station is the broadest of these contentions.

The EIS contains a substantial and detailed discussion of the north-south location of the line, specifying precisely why 63d Street was chosen.[16] However, as for east-west location along 63d Street, the EIS contains no discussion of alternatives. This, plaintiffs assert, violates NEPA's directive.

The argument, in the specific context of the case, is not imposing. Apart from the fact that plaintiffs saw, and accepted three years ago, the omission to discuss alternative locations to the east or west, the subject could never have been of substantial interest in fact. A judge sitting in this City is compelled to see the patent good sense— as DOT and plaintiffs must equally have

observed—of the central location chosen. Given the concrete and obvious facts addressed, the EIS amply covered the subject of station location, a segment of the whole, when it not only dwelt at length upon the decisive question of north-south placement of the line, but went on to record:

"A Transit-Land Use Committee which included representatives of the Metropolitan Transportation Authority, the Transit Authority, the Housing and Development Administration, the Economic Development Administration, the Transportation Administration, The City Planning Commission and the Urban Design Council did extensive work in connection with station locations on the Project. The information developed as to station locations including patronage estimates, drawings, recommendations, etc., were made available to both the Transit Authority's Engineering Department and its Consultants. The imput [sic] was of great value in making the final determinations as to station locations and configurations."[17]

While alternatives are to be considered, the requirement "must be judged against a rule of reason." *Sierra Club v. Lynn,* 502 F.2d 43, 62 (5th Cir. 1974) cert. denied, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975).[18] There is no reason to demand now, as plaintiffs never did before, more elaborate discussion of station location than the EIS supplied.

It is worth noting that plaintiffs do not tender even now any persuasive suggestion that a location to the east or west should be preferred or could be substituted at this late date. It seems overwhelmingly probable that redrafting the EIS in this respect

---

15. "The subway line proper, as it passes under 63rd Street, will be tunnelled totally underground and will involve no surface disruption. Plaintiffs have no objection to this work; and until March of this year, they had not objected to the Station because that, too, they had understood, would involve only minimal surface disruption—and this at the intersection of Lexington and Third Avenues, and not at 63rd Street itself." Plaintiffs' Memorandum of Law 3.

16. EIS at 17–23.

17. EIS at 40.

18. See *Inman Park, supra* at 33:
"alternatives should be geared to alternatives to the entire project covered by the EIS and not necessarily to individual components within the project. It is certainly not reasonable to expect an agency to conceive of every alternative to every component in a large government financed project."
See also *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1136 (5th Cir. 1974).

at this time would be a futile literary exercise. The commitments already made to the present location, when combined with the logic of that location, are conclusive practicalities. Plaintiffs, in pursuing injunctive relief, are burdened by this reality, *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* 508 F.2d at 937.[19]

"D. The EIS did not and does not disclose the numbers of riders that would be expected to use 63rd Street Station upon its completion, or the resulting impacts on the residential neighborhoods in the vicinity of the Station."

and

"E. The EIS did not and does not mention, much less consider, the urban impacts, including possible increases in crime and heightened security problems, that might follow from the location and operation of the 63rd Street Station."

Plaintiffs, under these headings, detail a series of objections, all, or substantially all, available three years ago, and none of much substance.

1. It is asserted that the EIS failed "to disclose the numbers of riders that would be expected to use 63rd Street Station * *." Plaintiffs say they are surprised to learn the station may be expected to be used by as many as 15,000 people per day. The assertion is groundless.

At the mandatory public hearing, to which the EIS refers, it was reported that "[t]he peak hour usage of this station is estimated at 6,300 passengers."[20] This easily translates into a daily total at least equal to, and probably greater than, the figure plaintiffs now cite. Even apart from this disclosure, the issue as to the numbers of persons is trivial, as plaintiffs must have expected some substantial use of the only Manhattan station on the 63d Street line.

2. Plaintiffs assert that the EIS failed to consider the effects of the station's presence on the "urban environment," including such effects as a possibly increased crime rate. Postponing momentarily the speculative character of the possible relationship between crime and subway stations, this general type of consideration is one which, to some degree, is required. See *Trinity Episcopal School v. Romney,* 523 F.2d 88, 93 (2d Cir.1975); *Chelsea Neighborhood Ass'n v. United States Postal Service,* 516 F.2d 378, 388 (2d Cir.1975); *Hanly v. Mitchell,* 460 F.2d 640, 647 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). And it is true that the EIS contains almost no discussion about the "urban effects" of the station, apart from noting that the entrances would be located in buildings so as not to congest the sidewalks in those areas.

On the other hand, in submissions made three years later, plaintiffs' arguments concerning crime and associated phenomena are essentially only speculation, unsupported by any empirical grounds in our record. It is surely not self-evident that subway stations, even air-conditioned ones, breed crime in the surrounding community. Knowing, at any rate, that the station and passengers would be somewhere on East 63d Street, the authors of the EIS were not clearly compelled to pursue such speculations. See *Environmental Defense Fund, Inc. v. Corps of Engineers, supra,* 492 F.2d at 1137.[21]

---

19. "[G]ranting an injunction appeared unjustified where the outcome was virtually undisputed, where the affected resource was not 'so environmentally unique [as to require] any special consideration,' and where extensive and thoughtful consideration had been given to mitigating the adverse environmental consequences of the project." *Id.*

20. Transcript of Public Hearing, November 20, 1972, at 19.

21. "Plaintiffs had the burden not only to demonstrate that in-migration was a *probable* effect of constructing the waterway which had been omitted from the statement, but also that such a population shift would have a *significant* adverse environmental effect. Both the lack of a record on this point and the lack of proof demonstrating that in-migration would have a significant adverse environmental outcome, constitute sufficient reasons for refusing to fault the impact statement for omitting any discussion of the result of new people moving

In connection with an EIS concerned with an entire subway, this aspect of plaintiffs' critique is of little or no effective meaning. Subways, by necessity, must have stations. To the extent plaintiffs' argument is directed against the station's location in *their* block, it "smacks of trying to dump the problem into someone else's backyard," *Town of Groton v. Laird,* 353 F.Supp. 344, 351 (D.Conn.1972). The problems of increased "crime, noise and urban blight," assuming they exist, are not essentially different in plaintiffs' block than it would be in the block or two east or west that would limit the alternatives. Again, therefore, it is highly significant that plaintiffs long ago acquiesced in the presence of the station. Their present assertion carries the flavor of a litigation afterthought.[22]

### F. Concerning the Authorship of the EIS

Although it was not relied upon at oral argument, plaintiffs, in their complaint and in their brief, made the argument that the EIS is in derogation of NEPA because not prepared by the "responsible [federal] official," 42 U.S.C. § 4332(2)(C). The assertion rests wholly upon the statement in the Foreword of the EIS that "[t]he major portion of the work is taken directly from the New York City Transit Authority Environ-mental Analysis." The Foreword, continues, however, by stating that "[p]ortions have been re-written wherever clarification was felt necessary, and sections were revised or added as appropriate."

Plaintiffs proceed from the sound premise that the federal agency should avoid "accepting without question the self-serving statements or assumptions of local agencies in connection with the preparation of EIS's." *Trinity Episcopal School v. Romney,* 523 F.2d 88, 94 (2d Cir.1975). Yet, it by no means follows that federal agencies may not utilize work done by state or local authorities, as long as the federal officials exercise their own independent judgment.[23] See 40 C.F.R. § 1500.7(c) (1975).[24] The soundness of this thought is scarcely to be doubted by judges, whose debts to able brief-writers are vast.

Here, the EIS, after stating its utilization of the Transit Authority work, gives assurance that independent review and judgment were exercised. Quite apart from the still extant presumption of official regularity, there is no reason to use the frank concession against the agency, and then ignore its affirmation that it did its duty. Upon this state of facts, the court can only conclude that the agency exercised its independent judgment, as it said it did, and,

---

into the underdeveloped area." *Id.* (footnote omitted; emphasis in original).

**22.** Plaintiffs say that the EIS does not discuss the effects of air conditioning, asserting surprise at the discovery that the station would be air conditioned, with increased usage of gratings, and possible increased heat on the street. The point is not substantial. There should have been no surprise, as it was reported at the public hearing that the station would probably be "air-cooled." Nor was it necessary for the EIS to discuss this matter of comparative detail; the decision to air condition or not does not rise to the level of a "major" action, cf. *Inman Park, supra* at 37–40. While it might have been better for the EIS to discuss this (and presumably to conclude that some extra heat outside is a fair price to pay for the comfort underground), the omission is minor at most.

**23.** See *Sierra Club v. Lynn,* 502 F.2d 43, 59 (5th Cir.1974) cert. denied, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975): "Neither is the

commitment offer or the impact statement fatally undermined by the direct participation of the developer and his experts in the underlying environmental and other studies. There is no NEPA prohibition against a state agency, financially interested private contractor or a new community applicant providing the federal agency, which must of necessity work closely with these parties, data, information, reports, groundwork environmental studies or other assistance in the preparation of an environmental impact statement. * * * NEPA demands only that 'the applicable federal agency must bear the responsibility for the ultimate work product designed to satisfy the requirement of § 102(2)(C).' "

**24.** *Conservation Society of Southern Vermont, Inc., supra,* 508 F.2d at 932 n. 23, noted that "[t]he guidelines do permit 'the use [after review] of initial information furnished by an applicant in the form of an EIS.' 38 Fed.Reg. 10865."

accordingly, conformed with the "authorship" requirements of NEPA.

### III.

For the reasons canvassed above, if the only problem were the adequacy of the EIS, plaintiffs could not prevail. The EIS is imperfect, to be sure. But its defects could by no means justify halting the construction of the 63d Street Station.

■ If this conclusion seemed more doubtful than it does, the doubt would be dissipated by consideration of the equities. Though violations of NEPA may be conclusively demonstrated, which is not the case here, the question of injunctive relief calls for the exercise of judicial discretion; "where the equities require, it remains within the sound discretion of a district court to decline an injunction, even where deviations from prescribed NEPA procedures have occurred." *Conservation Society of Southern Vermont, Inc., supra,* 508 F.2d at 933–34. The extreme tardiness of plaintiffs' suit—laches, in the doctrine of equity—as well as important public and private interests against them are commanding reasons for denial of injunctive relief.

Plaintiffs confront the question of laches when they write:

"The plaintiffs admittedly come to this Court at the eleventh hour, challenging an EIS that was prepared three years ago. But until the past month, plaintiffs had no apparent reason to seek relief. For as set forth in the affidavit of Lawrence P. J. Bonaguidi and the letter of Simon Rifkind filed in support of the motion for an injunctive relief, it was only in April 1976 that plaintiffs first learned of the extensive construction and cut-and-cover excavation that is planned. Until then, they had been led to believe that surface work would be modest and limited to the intersections of Lexington and Third Avenues. Nor did the EIS provide any different information.

"Under the foregoing circumstances, where their injury was revealed less than a month ago, plaintiffs have acted swiftly to assert their legal rights; and there can be no question but that this suit has been timely brought." [25]

The asserted justification for the delay, as has been noted, rests on questionable factual premises. In any event, the claimed excuses would account at most for the delay in asserting EIS defects relating to the construction process itself. This could not explain or justify plaintiffs' lateness in charging other inadequacies, all of which were, or should have been, apparent during the entire period of time since the promulgation of the EIS.

Even as to the construction methods, plaintiffs are, as has been noted, on infirm ground when they claim to have been kept in excusable ignorance until the work was ready to begin. There is in fact no suggestion of concealment by the Transit officials or, certainly, by the DOT defendants responsible for the EIS—or, indeed, by anyone. The plans and specifications were completed—and shown to, and discussed with, plaintiffs' Community Planning Board—no later than last November. If it was needed, there remained ample time then to reconsider and revise the EIS. Plaintiffs, obviously people who both possess and can enlist imposing legal talents, were chargeable through the three years of the EIS's existence with knowledge that the actual details of construction can become definitive only when they have been reduced to the precision of contractual statement. Plaintiffs were obliged in the circumstances to protect their interests by keeping informed. There was no duty upon any defendant—surely no duty upon those who authored the EIS—to keep plaintiffs advised of the subway's progress from day to day. There is no suggestion that plaintiffs could not have had what was laid before the Community Planning Board.

None of this is to doubt plaintiffs' good faith or to question the genuineness of their protests. It is to say that the the tardiness of their suit, when seen in the context of

**25.** Plaintiffs' Memorandum of Law at 23–24.

the devastating paralysis they seek of an integrated and ongoing public project, must be counted as an imposing obstacle to the claim.

■■■■ As to the law, laches will be applicable if it is demonstrated that there has been "a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted." *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975). The importance of delay as an argument against injunctive relief is enhanced when the overall project, of which only a piece is questioned, has progressed so far and been so largely set along irreversible lines that a temporary injunction could not realistically be expected to "serve the public interest and the purposes of [NEPA]." *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir. 1975). This is quite clearly a case where, in the period of plaintiffs' delay, "construction * * * [has] gone so far that for economic [and overriding environmental] reasons it would be impracticable or impossible to alter much of the basic plan." *Id.* Plaintiffs' delay is not persuasively justified or excusable. On the the other hand, the prejudicial impacts of an injunction now are clear and substantial.

Had plaintiffs bestirred themselves closer to the time three years ago when the EIS was published—or even as long ago as November 1975, when the final plans and specifications were laid before the Planning Board—the asserted omissions could have been supplied without the grave effects an injunction would now have. Now, however, a whole train of injuries must ensue if the people and the resources assigned for the 63d Street segment are to be blocked by a court decree. Jobs, money, and the environmental hopes of a far larger number of people are all to be postponed, in plaintiffs' view, because they did not personally know sooner what was available to be known for the safeguarding of their asserted rights.

The injuries to defendants include substantial economic costs associated with delaying a construction contract.[26] This court's restraining order led last week to the suspension of work already begun; the result of a further prohibition would be injury to employers and workers at a time when, this court may notice, the local construction industry is depressed. Cf. *Conservation Society, supra*, 508 F.2d at 937.

■■■ While "[d]elay and concomitant cost increases would not alone justify noncompliance with the Act," *Conservation Society of Southern Vermont, Inc., supra*, 508 F.2d at 937, they are factors to be considered in gauging the propriety of injunctive relief, *id.* at 933. They become of more substantial importance when, as detailed above, "extensive and thoughtful consideration [has] been given to mitigating the adverse environmental consequences of the project." *Id.*

Delays affect not merely the station, but the subway line of which it is a part. In a city already under strict directives to reduce its air pollution,[27] the ecological and other human benefits of a subway are obvi-

---

**26.** In affidavits submitted in opposition to this motion, the court is told that the contractor on the 63d Street Station has posted a payment bond and a performance bond, both with a premium of approximately $4,000 per week. Additionally, the contractor has payroll costs of some $30,000 per week. Thus, "[t]his four-week delay [the result of an agreement with plaintiffs] has already cost the Joint Venture $32,000 in premium payments and $120,000 in its payroll." Affidavit of Ronald Schiavone, sworn May 11, 1976, at 5. The Chief Engineer of the New York City Transit Authority notes that "[d]elay in a project of this magnitude becomes a very expensive matter. For exam-

ple, assuming an escalation rate of only 6% a year, the escalation would be $9 million dollars per year which, based on 260 working days per year, would be $34,000 for every working day that the contract is delayed." Affidavit of John T. O'Neill, sworn May 11, 1976, at 12. It is not necessary to adopt these figures as precisely accurate to recognize that the underlying concern is correct; substantial costs, including those due to inflation, are a real consequence of delay.

**27.** *Friends of Earth v. Carey*, Docket No. 75-7497, 535 F.2d 165 (2d Cir., 1976).

ous. They are, in any case detailed in the EIS, from which a partial summary may be quoted:

"1. The beneficial effects will be improvements in the mass transportation for the area and especially for the disadvantaged poor, elderly, and the handicapped.

"2. Reduction in automobile traffic will reduce traffic congestion.

"3. The air quality will improve in the area as a result of this project by decreasing automobile traffic." [28]

These benefits are undisputed; they are major and obvious enough so that no group, including plaintiffs, has sought to challenge the subway's construction on environmental grounds, just as no group spoke out against the project as a whole at the public hearing of November 20, 1972, as referred to in the EIS. See also 49 U.S.C. §§ 1601, 1601a, and 1601b.

It does not slight the beauty or the general benignity of plaintiffs' street to recognize that the primary public interest lies with the subway's rapid completion. The "eleventh hour," in the familiar phrase with which plaintiffs characterize their timing, is much too late to thwart that interest at their behest.

Plaintiffs' motion for a preliminary injunction is denied. The temporary restraining order issued on May 12, 1976, is vacated.

It is so ordered.

---

**28.** A more detailed discussion of the beneficial environmental impact of the new line, including analysis of effects on other forms of transportation, is found in the EIS at 25–28 and 38–39.