RIVERDALE ENVIRONMENTAL ACTION COMMITTEE ALONG THE HUDSON—R.E.A.C.H., Spuyten Duyvil Association, Promenade Tenants Association, Bronx Council for Environmental Quality Inc., Marvin Altshuler, Gloria Altshuler, Ed Derrico, Mohsen Ghajari, Thomas L. Bird, David J. Thompson, Dikran Dingilian, Sura Jeselsohn, Esther Braun, Ellen B. Hightower, and Gregory Charles Kisloff, Plaintiffs,

v.

METROPOLITAN TRANSPORTATION AUTHORITY and its Metro-North Commuter Railroad Company; and Urban Mass Transportation Administration, Defendants.

No. 86 Civ. 2912 (JMW).

United States District Court,
S.D. New York.

May 20, 1986.

**100**

William Hoppin, New York City, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. of N.Y., Randy M. Mastro and Mary Ellen Kris, Asst. U.S. Attys., New York City, for Urban Mass Transp. Admin.

Robert Lustberg, General Counsel for Metro-North, New York City, for Metropolitan Transp. Authority and its Metro-North Commuter R. Co.

## OPINION

WALKER, District Judge:

### INTRODUCTION

The plaintiffs, individuals and community organizations, seek to preliminarily enjoin design, construction, and federal funding of a Metro-North Commuter Lines power substation pending compliance with the National Environmental Policy Act 42 U.S.C. § 4321, *et seq.* ("NEPA").[1] At the hearing of the application for a preliminary injunction the parties consented to a consolidation of the trial on the merits with the preliminary injunction hearing. T. 458, 459.

### STATEMENT OF FACTS

The Spuyten Duyvil substation is part of the defendant Metropolitan Transit Authority's ("MTA") project to construct power substations for the operation of the Harlem and Hudson lines of its Metro-North Commuter Railroad System. The new system consists of thirty-eight substations: three are complete; twenty-two, including the Spuyten Duyvil substation, are under construction; and thirteen are in the design phase.

The purpose of the substations is to convert electric power supplied by a commercial utility into electric power usable on the railroad.[2] The electricity is transmitted from the substation to the third rail of the railroad to power trains. The electricity diminishes as it travels on the third rail and eventually dissipates. Thus, the substations must be placed at intervals along the tracks to ensure power along the whole track. The location of any one substation is dependent on its adjacent substations and therefore movement of one substation would affect the location of all the other substations. In the case of the Spuyten Duyvil substation location, a movement of more than 200 to 300 feet in either di-

---

1. The plaintiffs originally made an application for a temporary restraining order by an Order To Show Cause on April 11, 1986 to restrain the construction of two sites referred to as the "Spuyten Duyvil" and "Marble Hill" sites, respectively. At a hearing on the Order To Show Cause, the defendant Metropolitan Transportation Authority ("MTA") represented to the court that pilings would not be placed in the ground at the Spuyten Duyvil substation site until Monday, April 21, 1986. Based on that representation, the plaintiffs withdrew their application for a temporary restraining order and consented to adjourning the matter until Thursday, April 17, for a preliminary injunction hearing.

This court held that hearing on, April 17, and 22, 1986. At the commencement of the hearing, the plaintiffs stated that they had agreed with the United States Attorney to withdraw their application for injunctive relief with respect to the Marble Hill site. Thus, this case only involves the Spuyten Duyvil substation site.

Finally, the parties submitted posthearing briefs and corrections to the transcript of the hearing, the last of which was received by the court on May 6, 1986.

2. The railroad uses 700–volt power while commercial utilities supply power at 13,900 volts; thus the substations actually step down the power supplied by the utilities.

rection would affect location of the adjacent substations. T. 279.

In 1981 the MTA approached the Urban Mass Transportation Administration ("UMTA"), a subdivision of the United States Department of Transportation, to acquire federal funding for the Metro-North Commuter Lines' renovation of its antiquated electrical system, originally completed in 1906 and last modified in 1929. The MTA proposal was for the restoration and construction of power substations along the Harlem and Hudson lines to support the electrical demands of a technologically updated system to meet current commuter service needs.

In order to approve funding for a project, pursuant to NEPA, UMTA had to consider the environmental consequences of the action, *see* 42 U.S.C. 4321 *et seq.* The regulations separate federal actions into three classes that prescribe the level of documentation required in the NEPA process. Class I actions are those which may significantly affect the environment and require an EIS. 23 C.F.R. § 771.115(a); *see* 49 C.F.R. § 622.101. Class II includes "[a]ctions that do not individually or cumulatively have a significant effect on the environment." Referred to as "categorical exclusions," these actions do not require an environmental impact statement or environmental assessment. 23 C.F.R. § 771.115(b). Lastly, Class III encompasses those "[a]ctions in which the significance of the impact on the environment is not clearly established" and "require the preparation of an EA" or environmental assessment "to determine the appropriate environmental document required." [3] 23 C.F.R. § 771.115(c); *see also* 23 C.F.R. § 771.119.

In this case, UMTA required an environmental assessment, rather than an environmental impact statement. The MTA prepared an environmental assessment and sent it to UMTA on July 2, 1984. (*See* Defendants' Exh. L). After meeting with

UMTA officials on August 9, 1984, the MTA prepared a more detailed environmental assessment and submitted it to UMTA on August 21, 1984. (*See* Defendants' Exh. J).

The latter EA addressed a multitude of subjects, and included a description of the proposed action (Exhibit A at 3–5); an explanation of the need for the project (*id.* at 5–7); alternatives (*id.* at 7–9); environmental impacts (*id.* at 10–28); land use and zoning impacts (*id.* at 28–29); air quality impacts (*id.* at 29); noise impacts (*id.* at 29–31); water quality impacts (*id.* at 31); wetland impacts (*id.* at 31); flooding impacts (*id.* at 32); navigable waterways and coastal zone impacts (*id.* at 32); ecologically sensitive area impacts (*id.* at 32–33); traffic and parking impacts (*id.* at 33); endangered species impacts (*id.* at 33); energy impacts and conservation (*id.* at 34–35); historic properties and parklands impacts (*id.* 35–37); construction (*id.* at 37–39); aesthetics (*id.* at 40); community disruption (*id.* at 41); secondary development (*id.* at 41–42); consistency with local plans (*id.* at 42–44); an aerial photograph of the site; a photograph of the site; zoning and land use maps for areas adjacent to the substation sites; architectural descriptions; and renderings of typical substations.

In its environmental impacts section, the EA included specific sections on the Spuyten Duyvil site:

> The construction of the substation at Spuyten Duyvil will be at a site which requires no acquisition of property for the building and does not impact the City parkland which was originally inspected in March.

> The site is located on the west side of the main tracks, within the Railroad's Right-of-Way at the present position of an unused freight siding. Access to the site will be via the Railroad owned bridge for the Riverdale Yacht Club at 254th Street

---

**3.** "If no significant impacts are identified" in the environmental assessment and the UMTA Administrator agrees with that conclusion, the Administrator "will make a separate written finding of no significant impact ("FONSI")." 23 C.F.R. §§ 771.119(g) and 771.121(a). When a FONSI is issued, the agency does not require the preparation of an environmental impact statement.

and an access road to be built along and within the Railroad's R.O.W. [Right of Way].

The site will eliminate the need to use NYC parkland. The site is physically located on the west side of the main tracks, approximately 100 feet south of the site inspected on the tour of March 22, 1984. Construction will not require landfill or any other work in the Hudson River. The specifications will contain safeguards to prevent any adverse impacts to the Hudson River during the construction period. No displacements of homes or businesses will result from the construction of a substation at this site. Also, there are no significant impacts anticipated as a result of this construction.

*Id.* at 13–14.

Consistent with 23 C.F.R. § 771.121, UMTA then performed an independent assessment of the EA and the available information. Steven F. Faust, the Project Manager for UMTA who performed that assessment, recommended approval of a finding of no significant impact (FONSI). On November 15, 1984, the UMTA Regional Administrator, Richard T. Nasti, wrote to MTA Chairman Richard Kiley that "[b]ased upon the Environmental Assessment of the subject projects ... we have issued a Finding of No Significant Impact" for seventeen sites, including Spuyten Duyvil. Because of the "finding of no significant impact", no EIS was prepared or required by the agency's regulations. *See* 23 C.F.R. §§ 771.119 and 771.121.

Following the project's approval in November 1984, plaintiffs received actual notice of the irrevocable commitment of public funds for this reconstruction project. In November 1985, as part of an effort to keep its constituent communities apprised

of action regarding the reconstruction of the railway system, Metro-North had its contractor send a letter to the local Community Board 8[4] informing the board that construction of the Spuyten Duyvil substation would start in March of 1986.[5]

Finally, the plaintiffs filed this action on April 9, 1986.

## DISCUSSION

### Laches

Plaintiffs' application for preliminary relief comes after the decision to go forward with this renovation project was made and sixteen months after it was openly and publicly presented at the first of a number of meetings attended by some of the plaintiffs. Furthermore, construction at the Spuyten Duyvil site is now well under way and any delay at this point would not only affect the Spuyten Duyvil substation but also the other sites where renovation is to be done after the work at Spuyten Duyvil is completed. Plaintiffs have waited until beyond the eleventh hour to seek this relief.

It is well established that *laches* ordinarily bars an application for injunctive relief when "it is demonstrated that there has been a 'delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted.'" *East 63rd Street Ass'n v. Coleman,* 414 F. Supp. 1318, 1330 (quoting *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860, 867 (5th Cir.1975)).

A more deferential test is appropriate in a case where "[p]laintiffs are attempting to effect compliance by public officials with duties imposed by Congress under NEPA." *Steubing v. Brinegar,* 511 F.2d 489, 495 (2d Cir.1975). The Second Circuit test is

---

**4.** Community Boards represent citizens of each district in the City of New York. Both of the challenged substations are in Community Board 8's jurisdiction. It bears noting that Community Board 8 is not a plaintiff to this action.

**5.** The only plaintiff who testified, Thomas Byrd, admitted to full awareness of MTA's plans for

these substations as of November, 1984. He followed the progress of the project closely thereafter up until the January 1986 public hearing on eminent domain procedures for the *Marble Hill* site. (Hopper Aff. ¶ 10). Nonetheless, they waited yet another three months to bring this action.

whether the plaintiff's delay in bringing the suit has resulted in construction proceeding "to a point where any significant environmental damage has already been done" and whether, in the alternative, "construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan." *Id.*

■ Here, plaintiffs were fully aware of and participated in planning discussions regarding these substations, yet they have waited eighteen months to bring this suit. The entire system is dependent upon each substation. Relocating the Spuyten Duyvil substation more than 300 feet would require relocation of adjacent substations. The site was moved 100 feet from a previously proposed location to obviate the need to use New York City parkland. Over $67 million has already been invested in the project; $56 million of which has been spent since December 1984. The Court has no doubt that the plaintiffs are sincere and make their claims in good faith. Simply put, however, they have made those claims too late. The action could have been brought in the fall of 1984. At that time the planning and construction would not have progressed so far as to make it impracticable to delay the development of the Spuyten Duyvil site and other sites until an EIS, if needed, could be prepared.

As the court observed in *East 63rd Street Ass'n:*

> The importance of delay as an argument against injunctive relief is enhanced when the overall project, of which only a piece is questioned, has progressed so far and been so largely set along irreversible lines that a temporary injunction could not realistically be expected to "serve the public interest and the purposes of [NEPA]." *Steubing v. Brinegar,* 511 F.2d 489, 495 (2d Cir.1975). This is quite clearly a case where, in the period of plaintiffs' delay, "construction ... [has] gone so far that for economic [and overriding environmental] reasons it would be impracticable or impossible to alter much of the basic plan." *Id.* Plain-

tiffs' delay is not persuasively justified or excusable. On the other hand, the prejudicial impacts of an injunction now are clear and substantial.

414 F.Supp. at 1330.

Accordingly, the compelling public interest in favor of the continuation of this restoration of the Metro-North Commuter railway lines and the inevitable, substantial financial costs to defendants—and the public—which delay will cause, require denial of plaintiffs' application for injunctive relief.

### UMTA's Determination Not Arbitrary or Capricious

Even if plaintiff's failure to bring this action in a timely manner were not dispositive of this motion, the Court would not overrule UMTA's administrative determination.

#### Scope of Review

The applicable scope of review of an agency's threshold determination that an impact statement is not required under § 102 of NEPA is the "arbitrary", "capricious", "abuse of discretion" standard. *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir.1972) *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). In determining whether an agency has acted arbitrarily, capriciously, or abusively in refusing to require an impact statement, the appropriate role of the reviewing court is to assess whether the relevant agency has taken a "hard look" at the environmental consequences which are likely to result from the action in question. *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 35 (2d Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984); *Hanly, supra* at 830, 831. Thus, if the finding that an impact statement was not required was supported by substantial evidence of a lack of significant environmental consequences, this Court does not have the power to overrule the agency determination. *Town of Orangetown, supra* at 39.

*Statutory and Regulatory Framework*

Section 102 of NEPA requires a federal agency to prepare an EIS only for "major Federal actions *significantly* affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C) (emphasis added). Prior to any congressional or administrative interpretation of the term "significantly," as used in 42 U.S.C. § 4332(2)(C), the Second Circuit suggested that in determining significance:

the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change.

*Hanly*, 471 F.2d at 830–31.

The Department of Transportation regulations, issued after *Hanly*, call for preparation of an EIS in all "[a]ctions that may significantly affect the environment...." 23 C.F.R. § 771.115. The regulations further define that phrase by specifying classes of circumstances deemed to significantly affect the environment and thus require preparation of an EIS. None of those explicitly enumerated circumstances include a renovation project such as this one. Moreover, the "[a]pproval of utility installations along or across a transportation facility" is listed among the "Categorical Exclusions" which are defined as "[a]ctions that do not individually or cumulatively have a significant effect on the environment" and therefore "do not require an environmental impact statement or environmental assessment." 23 C.F.R. §§ 771.115(b), 771.115(b)(8).

Thus, UMTA made a finding that a utility installation along a transportation facility does not significantly affect the quality of the human environment. The rationale is clear: the proposed conduct conforms to an existing use, and therefore its adverse consequences are less significant. That appears to be the case here where the proposed substation site is adjacent to railroad tracks which are about fifty feet wide. Based on the UMTA regulations it appears that the MTA was under no obligation to embark on the lengthy and costly process of preparing an EIS. Indeed, it appears that UMTA, in directing the MTA to prepare an EA, required more than was necessary, since the substation could have been deemed a categorical exclusion.

The regulations provide for preparation of an EA, as distinct from an EIS, *see* 23 C.F.R. §§ 771.115, 771.119, "to determine the appropriate environmental document required," 23 C.F.R. § 771.115(c), and to "assist in determining the need for an EIS," 23 C.F.R. § 771.119(a). Those regulations further provide that "[i]f no significant impacts are identified," 23 C.F.R. § 771.119(g), UMTA "will make a separate written finding of no significant impact (FONSI) incorporating the EA and any other appropriate environmental documents." 23 C.F.R. § 771.121(a).

In compliance with 23 C.F.R. §§ 771.115 and 771.119, UMTA did utilize an extensive EA prepared by the MTA. On the basis of that EA, UMTA issued its formal "finding of no significant impact" ("FONSI") on the environment, thereby allowing the renovation project to go forward.

*UMTA's Action was Neither Arbitrary nor Capricious*

The remaining issue before the Court is whether UMTA acted arbitrarily and capriciously in issuing a FONSI and determining that an EIS was not required. First the Court notes that UMTA divided the project into a number of component parts and determined whether an EIS was required for each part. This may have been an error since it is improper to give "non-comprehensive consideration of a project divisible

into smaller parts, each of which taken alone does not have a significant impact but which taken as a whole has a cumulative significant impact...." *City of Rochester v. United States Postal Service,* 541 F.2d 967, 972 (2d Cir.1976). Here, however, the Court declines for several reasons to consider whether an EIS should have been prepared for the entire project.

While consideration of the project as a whole early in the review process would have afforded UMTA the opportunity to move the proposed substation sites to different locations, today the project has progressed to the point that moving any one of the interdependent substation sites more than a few hundred feet is virtually impossible and requiring a project-wide EIS is impracticable. Moreover, the plaintiffs *support* the project as a whole and challenge the location of only two of the thirty-eight substation sites, and only one of those two sites is presently before the Court. Therefore, the Court will only consider whether UMTA acted arbitrarily and capriciously in determining that an EIS was not required for the Spuyten Duyvil site.

■ Plaintiffs argue that UMTA failed to give adequate consideration to a number of issues before determining not to prepare an EIS. First, plaintiffs claim there was inadequate consideration of alternative sites. Section 102 of NEPA requires that all federal agencies "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). In the context of an EA, however, the CEQ regulations have interpreted NEPA to require only that a federal agency "[s]hall include *brief* discussions ... of alternatives...." 40 C.F.R. § 1508.9(b) (emphasis added). The Second Circuit has recognized that it "remains something of an anomaly to insist that an agency assess alternatives for an action that it has determined will not have a 'significant' effect on the environment." *City of New York v. United States De-*

*partment of Transportation,* 715 F.2d 732, 744 (2d Cir.1983), *cert. denied,* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984) (citing *Hanly II,* 471 F.2d at 836–37 (Friendly, J., dissenting)). Thus, the Second Circuit has held, in language appropriate to the case at bar, that

> an agency's finding of no significant impact, if otherwise valid, permits the agency to consider a narrower range of alternatives than it might be obliged to assess before undertaking action that would significantly affect the environment.

*Id.* at 744; *see* 40 C.F.R. § 1508.9(b). UMTA considered at least two locations for the Spuyten Duyvil substation. The original location east of the tracks was abandoned because it would interfere with New York City parkland and an alternate site west of the tracks and one hundred feet south of the first location was chosen. Since the location of the substation can only be moved 200 to 300 feet north or south, considering two sites in this area was not an arbitrary or capricious decision given the agency's finding of no significant impact.

■ Next, plaintiffs complain that UMTA did not consider whether the Spuyten Duyvil substation site would violate deed restrictions of area landowners. The defendants objected to the admission of evidence of deed restrictions on the grounds that it was outside of the administrative record (Defendants' Exh. A–Z) and that it was offered without a proper foundation. The deeds, according to the plaintiffs, relate to land conveyed to the City of New York Parks Department. The Court agrees with the defendants that the plaintiffs' have failed to establish that the deeds and the deed restrictions pertain to the property in question but disagrees with their contention that the Court is limited to merely reviewing the administrative record. Evidence of any deed restrictions may be considered as bearing upon the adequacy of UMTA's research or analysis. *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1385 (2d Cir.1977). But here, even if the deeds were properly ad-

missible, and assuming *arguendo* a proper foundation, they do not help the plaintiffs.

The City of New York Parks Department, the only entity identified which has a direct interest in these deeds, is not a party to this action and has not objected to the construction of the substation at Spuyten Duyvil. The administrative record shows that the Parks Department (along with the City of New York Mayor's Office and the New York State Parks and Recreation Department among others) was contacted prior to the completion of the EA and the finding of no significant impact. (Defendants' Exh. A, p. 44). The decision by UMTA not to inquire further into any deed restrictions when the affected landowner, the City of New York Parks Department, had been contacted and did not raise the issue is neither arbitrary nor capricious. Moreover, it is significant that these plaintiffs, closely involved in the administrative proceedings for eighteen months, never presented any issue involving deed restrictions to UMTA and raised the issue for the first time at this hearing.

In any event, assuming once again that the deeds apply to the property in question, the proposed project does not violate the deed restrictions. One deed dated April 10, 1906, states in pertinent part that "no power house or egine [sic] house shall be erected." At that time, power or engine houses were huge multi-story structures over 200 feet high with large smokestacks towering over them. (See MTA Exhibits WWW and YYY.) The smokestacks were necessary because the railroads burned coal at that time to generate power. The relatively small substation presently under construction bears no resemblance to the immense power houses of that earlier era. The deed was meant to restrict the construction of a 1906 power house, not a 1986 substation.

Other deeds restrict the use of the property to "railroad and roadbed" purposes. (Plaintiffs Exhibits 3, 4 and 5). This restriction is not violated since the construction and maintenance of the Spuyten Duyvil substation is for railroad purposes. Another restriction in the deeds require the defendants to "maintain a strip of the land . . . ten feet in width . . . along the westward side of the premises. . . ." The plaintiffs have not shown how the construction would violate this restriction. Moreover, the Parks Department, as successor in interest, has not sought to enforce this eighty year old restriction, and, since it does not have any apparent actual or substantial benefit to the Parks Department, it is, in all probability, unenforceable. *See* N.Y. Real Prop.Acts, § 1951 (McKinney 1979 & Supp.1986).

Plaintiffs complain further that the EA violates NEPA because it was prepared by the MTA and only reviewed by UMTA. This argument is also without merit. The applicable regulations provide that "[t]he EA shall be *prepared by the applicant* in consultation with the Administration. . . ." 23 C.F.R. § 771.119(a) (emphasis added). Moreover, federal agencies may use the work done by state or local authorities, as long as the federal officials exercise their own independent judgment. *East 63rd Street Association v. Coleman*, 414 F.Supp. at 1328; *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir.1974) *cert. denied*, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975). UMTA officials visited the sites, required information from the MTA and met with MTA officials before making their findings. The Court is satisfied that UMTA officials exercised their independent judgment.

The plaintiffs also claim that UMTA failed to consider the aesthetic and visual impact of the proposed substation. It is questionable whether a court should even apply the "hard look" doctrine to aesthetic environmental factors because of the analytic difficulties such a judicial inquiry presents. *Maryland-National Capitol Park & Planning Commission v. United States Postal Service*, 487 F.2d 1029 (D.C. Cir.1973); *River Road Alliance, Inc. v. Corps of Engineers of United States Army*, 764 F.2d 445, 451 (7th Cir.1985) ("Aesthetic objections alone will rarely compel an impact statement."). The EA did, however, address these aesthetic con-

cerns. The EA included a rendering of the substation and aerial photographs of the areas and the UMTA officials visited the area of the proposed site. Based on this information, UMTA made an independent judgment that the aesthetic and visual impact of the substation on the area was insignificant. Even though the Court believes the aesthetic effect of a project is an important concern,[6] the administrative record supports UMTA's determination of no significant impact. This Court finds, therefore, that this determination was neither arbitrary nor capricious.

Finally, the plaintiffs complain that UMTA did not give adequate consideration to the possible impact that construction may have on the Hudson River as a navigable waterway.[7] The EA states that "[c]onstruction will not require landfill or any other work in the Hudson River." "The specifications will contain safeguards to prevent any adverse impacts to the Hudson River during the construction period." (Defendants Exh. A, p. 14; *see also* p. 32). This statement, together with UMTA's own familiarity with the area gained through physical inspection and photographs, provided UMTA with the information upon which it made its decision. The decision was neither arbitrary nor capricious.

Therefore, the plaintiffs' application for preliminary and permanent injunctive relief is denied.

**6.** This view is shared by the MTA. The engineer in charge of the planning, design, construction and placement into service of substations testified at trial that the MTA plans to work in conjunction with the community board to develop landscaping plans for the substation to lessen any adverse visual impact of the substation on the area.

**7.** The plaintiffs offered photographs of alleged dumping into the Hudson River. It is unclear from the photographs whether anything was dumped into the river. The Court accepts the credible testimony of Steven Yandrich of the Army Corps of Engineers. Yandrich, a physical scientist, testified that he inspected the site after the alleged dumping and found no evidence of it. He concluded that the project was outside of the Corps jurisdiction.