SIERRA CLUB, Plaintiff,

v.

Clifford ALEXANDER, Individually and as Secretary of the Army of the United States; Lt. General John W. Morris, Individually and as Chief of Engineers, Army Corps of Engineers; Col. Clark H. Benn, Individually and as District Engineer, New York District, Army Corps of Engineers; and Pyramid Company of Utica, Defendants.

No. 79–CV–770.

United States District Court, N. D. New York.

Feb. 5, 1980.

---

458

Plunkett & Jaffe, White Plains, N.Y., for plaintiff; Joel H. Sachs, New York City, of counsel.

George H. Lowe, U.S. Atty., Syracuse, N.Y., for John W. Morris, Clark H. Benn & Clifford Alexander; Gustave J. DiBianco, Jay Hecht, New York City, of counsel.

Finley, Kumble, Wagner, Heine & Underberg, New York City, for defendant Pyramid Company of Utica; Donald Snider, New York City, of counsel.

MEMORANDUM—DECISION
AND ORDER

McCURN, District Judge.

This matter was originally before the Court on motion for a temporary restraining order and a preliminary injunction brought by plaintiff to halt construction by defendant Pyramid of a shopping center mall in the Town of New Hartford, New

York. Pursuant to Rule 65(a)(2) of the Fed.R.Civ.Pro. the Court ordered the trial of the action on the merits advanced and consolidated with the evidentiary hearing on the preliminary injunction application with the consent of the parties herein, during the course of the evidentiary hearing which commenced on December 3, 1979, and continued through December 14, 1979.

Plaintiff, Sierra Club, is a national not-for-profit corporation with a longstanding concern for the protection and enhancement of the environment. Founded in 1892, the Club has approximately 180,000 members nationwide, 10,000 members in New York State and some 100 members in the Utica-New Hartford area.

Defendant, Clifford Alexander, is the Secretary of the Army and is responsible for the administration of the Army Corps of Engineers. Defendant, Lt. General John W. Morris, is Chief of the Army Corps of Engineers of the United States Army and is responsible for ensuring compliance by the Corps with applicable statutes, regulations and executive orders. Defendant, Col. Clark H. Benn, is District Engineer for the New York District Corps of Engineers and is responsible for the issuance of permits in the New York District.

Defendant, Pyramid Company of Utica ("Pyramid"), is a partnership formed for the purpose of developing a regional shopping mall in the Utica-New Hartford area.

The complaint in this action was filed November 27, 1979. In it plaintiff seeks declaratory and injunctive relief halting construction of the shopping center mall until such time as the Court is satisfied that the Army Corps of Engineers has complied with all of the requirements set forth in the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*; The

Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661 *et seq.*; The Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1344; The Rivers and Harbors Act of 1899, as amended, 33 U.S.C. §§ 401 & 403[1]; certain regulations promulgated pursuant to the above Acts and Executive Orders Nos. 11988 and 11990.[2]

By virtue of an amendment to its complaint, allowed by the Court during trial, plaintiff also requests issuance of an order directing defendants to remove any fill material which has been placed on the project site and requiring restoration of the site to its preconstruction condition.

In addition to plaintiff's request for a preliminary injunction, all parties have moved for summary judgment. Jurisdiction is predicated upon 28 U.S.C. § 1331(a) and 28 U.S.C. §§ 2201 and 2202.

## BACKGROUND

*1979 Project Proposal*

The regional shopping mall proposed by defendant Pyramid in 1979, is currently under construction on a 115 acre site near the southeast corner of the intersection of Routes 5 and 5A in the Town of New Hartford, approximately two miles west of the City of Utica, New York. The fully enclosed one story mall will upon completion occupy nearly sixty acres of the total site and will contain three major department stores (Sears, J.C. Penney, and Hess). The gross building area will be 850,000 square feet with 770,000 square feet of leasable space. Parking is planned for 3,960 cars.

Prior to the commencement of work on the project, the site consisted of uplands and approximately fifty-five acres of wetlands, including streamside and cattail wetlands and swamp areas. A predominant

---

**1.** Plaintiff's third cause of action, claiming violation by the defendant of The Rivers and Harbors Act of 1899, as amended, 33 U.S.C. §§ 401 & 403, was dismissed on motion by defendant Pyramid at the close of plaintiff's proof.

   The motion was granted on the ground that plaintiff had failed to prove that Mud Creek was a "navigable" body of water, an essential requirement for applicability of The Rivers and

Harbors Act. See *Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579, 207 Ct.Cl. 323 (1975).

**2.** Executive Order No. 11988, "Floodplain Management," dated May 24, 1977, is published at 42 F.R. 26951. Executive Order No. 11990, "Protection of Wetlands," also dated May 24, 1977, is found at 42 F.R. 26961.

feature of the site is Mud Creek and its low lying flood plain. Mud Creek, a moderately sized tributary to Saquoit Creek, meanders through the site in a northeasterly direction. The Creek bank, prior to construction, was stabilized with vegetation, trees and shrubs. Its flood plain, described as a one-hundred year flood contour, slowed the effect of downstream flooding.

The mall site is generally agreed to have been a productive area for diverse fish and wildlife species, including such fish species as shiners and suckers and wildlife species as skunks, rabbits, song birds, black ducks, woodcock, pheasants and marsh hawks. Wildlife presence is due in part to the high ratio of "edges" on the site.[3]

Construction of the mall will involve filling in approximately thirty-eight acres of wetlands on the site with a resulting loss of the area as a wildlife habitat. This is due in part to the destruction of the vegetative cover. The flood control function of the site's open space drainage area will also be lost. In addition, construction involves the rechannelization of around 2,000 linear feet of Mud Creek.

In order to lessen the environmental impact of the project, certain mitigation measures have been proposed by defendant Pyramid. On-site measures include the construction of three detention basins, designated A, B and C, which will provide 150% of the preconstruction storm capacity of the site. An additional four acres of cattail wetlands will be created in the detention basin area. The new bed constructed for Mud Creek will contain meanders and riffles along with shore line plantings.[4] The old Creek bed will be filled in with on-site materials.

Off-site mitigation measures have also been included in the proposal. Defendant

Pyramid has agreed to purchase nearly 159 acres of land approximately one and a half miles upstream from the project site in an area known as the "Limberlost" property. This property was described by one witness as a mono-type wet meadow.

The off-site mitigation plan calls for the creation of new wetlands in the uplands area of Limberlost, and the construction of four small ponds on that site. Wetland plantings are to be made on the property by Pyramid. This property is then to be deeded over to the Town of New Hartford for public use. Work by Pyramid with regard to both on-site and off-site mitigation measures is to be closely monitored by the New York State Department of Environmental Conservation (DEC).

*1977 Project Proposal*

The project previously described was not the first proposal by a Pyramid related company for the construction of a regional shopping center mall in the Utica-New Hartford area.

In 1977, Pyramid Systems, Inc., proposed the construction of a shopping center mall in the same general areas as the one now under attack. However, the permits necessary under New York State Law were denied on March 12, 1978, after a public hearing, in a decision by then Commissioner of the State DEC, Peter A. Berle. The permits were denied based upon the failure of the applicant to demonstrate need for the project and the unavailability of alternatives, in a clear enough manner, to allow balancing of the socio-economic benefits of wetlands with that of the socio-economic development of the State of New York through construction of the mall. A request for reconsideration was denied on July 18, 1978, on the same general basis.

---

**3.** "Edges", as defined in the June 22, 1979, hearing report of the New York State Department of Environmental Conservation (DEC) at page 36, are "the area[s] of interface between diverse cover types."

**4.** Defendant Pyramid originally proposed a straight channel for relocated Mud Creek. The change to a meandering bed with riffles resulted from a stipulation entered into by Pyramid

with Trout Unlimited, read into the record at the State DEC hearings on April 5, 1979, at page 40.

It should be pointed out that numerous changes were made in the originally proposed mitigation measures, as a result of public comment and opposition and upon suggestion by the state DEC.

Plaintiff contends that the 1977 proposal and the 1979 proposal are virtually identical. However, the hearing officer at the State DEC public hearings on the 1979 proposal made a finding that the project was an entirely new proposal and not a resubmission of the 1977 plan.[5] In fact, according to defendant Pyramid, new applications for permits were submitted at the suggestion of State DEC officials.

*State DEC Involvement With the 1979 Proposal*

Under New York State law, defendant Pyramid was required to obtain a freshwater wetlands permit, an indirect source permit and an impoundment permit from the New York State DEC. Approval of the project was also required under the State Environmental Quality Review Act (SEQRA). New York State ECL §§ 8–0101 et seq.[6]

Although it is the issuance of a permit pursuant to Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1344,[7] which is the focus of this action, a review of the actions of the New York State DEC with regard to State require-

ments is both helpful and necessary in deciding this lawsuit.

Defendant Pyramid, in accordance with the requirements set forth in the N.Y. ECL at § 8–0109(2),[8] caused to be prepared and submitted to the State DEC a draft environmental impact statement ("DEIS") and a document entitled "Storm Water Management Report."[9]

The DEIS contained analyses of the socio-economic impact of the project (retail-analysis), air and water quality, traffic, energy use and conservation, impact on soil and geological resources, and impact on the vegetation and wildlife on the site. It also included discussion of the unavoidable impacts, the proposed mitigation measures and alternatives, including both the no build alternative and alternative sites.

Beginning on March 6, 1979, and concluding April 6, 1979, the State DEC conducted nineteen days of public hearings on the applications. Plaintiff, along with several other environmental organizations, was a party to the hearings. The Club was represented by one of its members who resided in New Hartford.[10]

---

5. Testimony elicited at trial indicated that the 1977 project called for a two level mall with a two level parking facility to be constructed on a 70–75 acre site in the same general area as the 1979 proposal. Although both required rechannelization of Mud Creek, the earlier proposal's flood control measures would have offered only 100% flood capacity as opposed to the 150% offered by the new proposal. In addition, the 1979 project calls for the preservation of seventeen acres of on-site wetlands, in addition to the creation of the four new acres of cattail wetlands.

6. The purpose of SEQRA as set forth in Section 8–0101 of the ECL is:

"to declare a state policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state."

7. 33 U.S.C. § 1344 provides for the issuance of permits by the Secretary of the Army for the discharge of fill material into bodies of water. Defendants do not dispute the necessity for a Section 404 permit in this case.

8. ECL § 8–0109(2) requires submission by the applicant of an environmental impact statement on any proposed action which "may have a significant effect on the environment."

9. The DEIS was prepared by Jason M. Cortell and Associates, Inc., in association with Alfred H. Dal Pos, AIA; Graham & Egleston; HSG/Gould Associates; Harbridge House Inc.; Impact Consultants, Raymond Keyes Engineers P.C.; and Schwartze, Steinberg, Tobia, and Stanziale. The "Storm Water Management Report" was prepared by Raymond Keyes Engineers P.C.

10. The Executive Director of the Chapter of the Sierra Club which includes the Utica-New Hartford area, testified that at its March 1979 meeting, the Executive Committee voted to become involved in opposing the mall project and authorized Diane Palmer to represent it at the State DEC hearings.

According to Ms. Palmer, she had no legal training or prior experience with public hearings and did not realize that she would be playing a significant role in the hearings. However, the hearing report at pages 7–8 shows that Ms. Palmer did make two motions at the commencement of the hearings, includ-

The June 22, 1979, decision of Robert F. Flacke, Commissioner of the State DEC, based upon the findings in the fifty-five page hearing report (also designated as the final environmental impact statement) submitted by the hearing officer, Robert S. Drew, directed issuance of the requested permits. In issuing the permits, the State DEC determined that the project was consistent with local land use plans, that it would fulfill a need in the area for a full-line department store, and that the loss of the wetlands would be adequately compensated by the proposed mitigation measures.

Pursuant to recommendations in the hearing report, issuance of the permits was conditioned upon submission to the DEC of construction plans, a schedule for completion of the detention basins, the new channel for Mud Creek, erosion control measures, proposed on-site plantings, and the work to be done on the Limberlost property. Pyramid was also required to post a $100,000 bond to insure successful completion of the work on both sites.

*Section 404 Permit*

On January 23, 1979, defendant Pyramid submitted an application for a Section 404 permit to the New York District Office of the Army Corps of Engineers. The application contained a description of the activity for which the permit was sought, stating that it:

" . . . consists of realigning 2,000 ± l. f. of Mud Creek, construction of two entrance roads with culverted stream crossings, construction of 1,400 feet of dikes and construction of storm water detention areas to accommodate a regional Mall Shopping Facility. After completion of the new channel and crossings, the existing creek bed and adjacent lands will be filled with on-site material."

ing one for denial on the basis that the project was identical to the earlier proposal. Both motions were denied.

11. Letters of "no-comment" were sent to the Corps by the National Oceanic and Atmospheric Administration (NOAA) and the United States Coast Guard in response to the public notice,

Included with the application were site drawings, a site photo, and three copies of the "Storm Water Management Report."

After making a preliminary determination that an Environmental Impact Statement (EIS) was not required, Corps officials prepared and sent out a public notice regarding the application. The Environmental Protection Agency (EPA), upon receipt of the notice, expressed concern over issuance of the permit and requested that a meeting be held with interested Federal officials and a Pyramid representative. The meeting was held on May 30, 1979, at the Corps offices in New York City and was followed by a site visit on June 14, 1979.[11]

Although subsequent to the meeting and site visit, the EPA dropped its objection to the issuance of the permit, United States Fish and Wildlife Services (FWS) continued in its objection to the issuance of the permit. Modifications to the project proposed by FWS were, however, rejected by both defendant Pyramid and future tenant J.C. Penney.

On August 22, 1979, an Environmental Assessment of the impact of the project was issued by Corps officials. A Supplemental Assessment dealing with the comments received in response to the public notice and Pyramid's response to those comments was issued on September 13, 1979.

A Section 404 permit was issued to defendant Pyramid on September 24, 1979, over the still unresolved objection of the Fish and Wildlife Service. A special condition contained in the permit required Pyramid to submit to the Corps office all of the construction plans and schedules which are to be submitted to the State DEC, after DEC approval has been obtained.

DISCUSSION

Plaintiff claims that the Army Corps of Engineers erred in determining that is-

and these Agencies were not represented at the meeting or site visit.

Although the meeting was scheduled in response to EPA concerns and attended by an EPA representative, FWS officials had also expressed concern over the project and had a representative in attendance at both the meeting and site visit.

suance of a Section 404 permit to Pyramid did not require the preparation of an EIS pursuant to Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). Furthermore plaintiff contends that the Corps failed to comply with the requirements of NEPA, NEPA Regulations and the Corps' own Regulations in processing Pyramid's application, and that it in general, failed to adequately review and analyze the potential environmental impact of the mall proposal before issuing the permit. More specifically, plaintiff alleges failure by the Corps to comply with public notice requirements, to consider alternatives to the proposal and to prepared an adequate administrative record of its processing of the application. Finally, plaintiff asserts that the Corps violated the Fish and Wildlife Coordination Act, *supra.*, by failing to give sufficient weight to Fish and Wildlife Service views of the proposal.

Defendants, however, argue that plaintiff should be barred from litigating its claims before this Court through application of the doctrines of *res judicata* and collateral estoppel.[12]

*Res Judicata and Collateral Estoppel*

Defendants argue that the plaintiff had a full and fair opportunity to litigate the issues now raised as a party to the State DEC public hearings, and should therefore be precluded from relitigating those same claims.[13] In support of the estoppel argument, defendant Pyramid points out that as applicant, it satisfied the burden of showing by a preponderance of the competent, relevant and material evidence that the State permits should be issued [See 6 N.Y.C.R.R. § 621.14(g)(iii)].

■ It is clear that there are instances in which *res judicata* and collateral estoppel should be applied to State administrative hearings. See *United States v. Utah Constr. Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Safir v. Gibson*, 432 F.2d 137 (2d Cir. 1970), *cert. denied* 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970).[14]

■ However, application of *res judicata* is permissible only in cases involving the same cause of action previously decided in an adverserial proceeding between the same parties or their privies. *Commissioner v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). This lawsuit involves allegations of the violation of Federal statutes, regulations and executive orders. Although the same project was considered at the State DEC hearings, those hearings were held exclusively for the purpose of determining whether State environmental permits should be issued. The causes of action being decidedly different, application of the doctrine of *res judicata* would be improper in this case.

■ Application of collateral estoppel would also be inappropriate in this lawsuit. The doctrine may be applied to prevent relitigation of issues previously decided in a judicial proceeding between the same par-

---

**12.** Defendants have asserted a laches defense as well. However, that claim is more appropriately addressed at a later point. In addition, the Government defendants have challenged plaintiff's standing to bring this action. Defendants moved for dismissal on that ground during trial, and the motion was denied based upon testimony by the Executive Director of the local chapter of the Sierra Club indicating use of the site by Club members for the observation of flora and fauna. No further discussion on standing is necessary. See *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

**13.** 6 N.Y.C.R.R. § 621.14(d)(3) provides that: "Every party shall be afforded a reasonable opportunity to: present written or oral statements of positions and arguments on issues of law; present unsworn statements; present sworn testimony and other evidence on issues of fact; and conduct cross-examination of witnesses provided however, that irrelevant, immaterial or repetitious cross-examination shall be excluded at the discretion of the hearing officer."

**14.** In *Utah Const., supra*, Court review of a decision of the Armed Forces Board of Contract Appeals was sought. The Supreme Court found that when an administrative agency acting in a judicial capacity resolves disputed issues of fact before it, which the parties have had an adequate opportunity to litigate, a Court is empowered to apply the doctrine of *res judicata*.

ties or their privies, regardless of whether the cause of action is identical. *Commissioner v. Sunnen, supra.* As with *res judicata*, its application to administrative determinations is flexible rather than mandatory. In determining applicability, the Court should consider:

"(1) the effect which such determinations are accorded by the courts of the jurisdiction within which they are made;

(2) the type of hearing which is held and the procedures which are followed by the agency; and

(3) the intention of the administrative body and the expectations of the parties before it on the question of finality." (citations omitted) *Mitchell v. National Broadcasting Co.,* 553 F.2d 265, 269 (2d Cir. 1977).

See also *Taylor v. New York City Transit Authority,* 309 F.Supp. 785 (E.D.N.Y.), aff'd. 433 F.2d 665 (2d Cir. 1970); *Whitman Elec. Inc. v. Local 363, Int. Bro. of Elec. W.,* 398 F.Supp. 1218 (S.D.N.Y.1974).

■ Although the hearings were apparently conducted with attention to judicial formalities, the intention of the hearing officer was clearly not to bind any Federal agency with regard to issuance of Federal permits required for the project.[15] In any event, the State DEC could not·relieve the Corps of its obligation under NEPA or bind it in its determinations.

The only expectation of finality which defendant Pyramid could have reasonably anticipated as a result of the hearings was as to the State permits. Issuance of those permits is not being challenged, and this Court is not being asked to redetermine the merit of State DEC approval to the project.[16]

Furthermore, there is some question as to whether plaintiff actually did have a full and fair opportunity to litigate the issues which have been raised again in this lawsuit, in light of Ms. Palmer's admitted ignorance of the importance of her role as plaintiff's representative at the hearings and her lack of legal training or experience. Therefore, the Court determines that collateral estoppel is not applicable in this case.

*Standard of Review*

■ As recognized by plaintiff, judicial review of administrative determinations under NEPA, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.,* is limited, in the Second Circuit, to deciding whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). See *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Cross-Sound Ferry Services, Inc. v. United States,* 573 F.2d 725, 729–30 (2d Cir. 1978); *Hanly v. Kleindienst,* 471 F.2d 823, 829–30 (2d Cir. 1972), *cert. denied* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) ("Hanly II").

The standard of review in cases challenging agency actions and determinations under NEPA is a narrow one. Review is based solely upon the administrative record, which the agency has an affirmative obligation to develop.[17] *Hanly v. Kleindienst, supra.* at 836; *Hanly v. Mitchell,* 460 F.2d 640, 647 (2d Cir.), *cert. denied sub nom. Hanly v. Kleindienst,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) ("Hanly I").

---

**15.** The State DEC hearing report at page 55, paragraph 14, stresses that "granting of the approvals by the Department for this project as herein indicated does not relieve the applicant of its responsibility to also obtain all required approvals from the aforementioned New York State Department of Transportation, the U.S. Army Corps of Engineers and from any other unit of government having jurisdiction."

See also *Conn. Light & Power Co. v. Federal Power Com'n.,* 557 F.2d 349, 353 (2d Cir. 1977) in which the Court emphasized that "the conclusive effect of an administrative determina-

tion is limited to the purpose for which it was made."

**16.** The appropriate method for challenging the DEC decision would be by way of an Article 78 proceeding (N.Y. CPLR §§ 7801 *et seq.*) in New York State Court.

**17.** When sufficiently important issues are raised to justify an exception, plaintiff may be allowed to introduce new evidence. *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

The test is primarily one of rationality. The Second Circuit in *Cross-Sound Ferry Services, Inc. v. United States, supra.* at 729–730, stated that:

"Once it has been determined that decisions are supported by substantial evidence,

'[a] reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' *Citizens to Preserve Overton Park* [401 U.S. 402] at 416 [91 S.Ct. 814 at 824, 28 L.Ed.2d 136] [(1971)]. The agency must articulate a 'rational connection between the facts found and the choice made.' *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). . . . [W]e will up hold a decision of less than ideal clarity if the agency's path may be reasonably discerned. *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed.2d 1206] (1945). [*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)]."

Thus, where the agency decision is based on "substantial relevant evidence, fairly ascertained, and if it has made no clear error of judgment," (*Cross-Sound Ferry Services, Inc. v. United States, supra*, 573 F.2d at 730) the Court may not overturn the determination.

*Corps' Treatment of the 1979 Proposal as a New Application*

█ Plaintiff has from the beginning argued that the mall proposal presently under attack is virtually identical to the 1977 mall proposal. In taking this position, plaintiff contends that the Pyramid application for a Section 404 permit on the 1979 project was inaccurate since it indicated that permits necessary for the project had not previously been denied.

According to plaintiff, the Corps would have handled the application differently had it been aware of the previous denials on the 1977 project. In fact, if Pyramid had resubmitted the 1977 project applications to the State DEC, the Corps would have been required to await State DEC approval before processing the resubmitted Section 404 permit application. 33 C.F.R. § 320.4(j)(1).

That, however, is not the case here. Pyramid submitted new applications to the DEC on what it believed to be a new project and submitted a new application to the Corps simultaneously. Although there are without a doubt many similarities between the projects, there is no proof that defendant Pyramid was intentionally attempting to mislead Corps officials and no proof that the Corps would ultimately have handled its investigation of the project in any different manner.

*NEPA*

Plaintiff also alleges that the Army Corps of Engineers was in error in determining that issuance of a Section 404 permit to Pyramid was not an action which would have a significant affect on the quality of the human environment,[18] thereby requiring preparation of an environmental impact statement (EIS) under Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). That section provides in part that:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

18. Defendants do not deny that the issuance of the Section 404 permit in this case qualified as a "major Federal action" under 42 U.S.C. § 4332(2)(C).

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

Prior to the existence of any Congressional or administrative interpretation of the term "significantly" as used in 42 U.S.C. § 4332(2)(C), the Second Circuit suggested in *Hanly II* that in determining significance:

"the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. Where conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change." 471 F.2d at 830–31.

The Council on Environmental Quality (CEQ) has, since *Hanly II*, issued regulations which offer guidance for ascertaining the significance of the environmental impact of a proposed action.[19]

█ The Army Corps of Engineers, a responsible Federal agency, had the authority to make the threshold determination of significance in deciding the necessity for preparation of an EIS. *Hanly I, supra*, at 644. However, in exercising that discretion, the Corps was obligated to take a "hard look" at the environmental consequences of issuance of the permit, prior to making the decision. *Hanly I, supra*, at 646.

█ The Court is convinced that the Corps' review of the environmental impact of the mall project satisfies the requirements of *Hanly I* and *Hanly II*, as well as the dictates of 40 C.F.R. § 1508.27.

In processing Pyramid's application for a Section 404 permit, Corps officials admittedly took advantage of the availability of materials concerning the environmental impact of the project which were prepared for the State DEC. Officials also reviewed the State DEC hearing report and decision, and while it is true that Corps officials cannot rely solely upon studies and reports prepared by Pyramid or even the decision of the

---

19. 40 C.F.R. § 1508.27 provides in pertinent part that:

" 'Significantly' as used in NEPA requires considerations of both context and intensity:
(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.
(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity.

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial. . . .
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial. . . .
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. . . ."

State DEC, [See *Trinity Episcopal School Corporation v. Romney*, 523 F.2d 88, 94 (2d Cir. 1975); *Steubing v. Brinegar*, 511 F.2d 489, 496 (2d Cir. 1975)], the officials are clearly not prohibited from utilizing the material so long as they exercise independent judgment. *East 63rd Street Ass'n. v. Coleman*, 414 F.Supp. 1318, 1328 (S.D.N.Y.1976), aff'd. without opinion, 538 F.2d 309 (2d Cir. 1976). In fact, cooperation between state and federal governments is encouraged under NEPA in order to avoid duplication of efforts.[20]

Although plaintiff would have the Court believe that the Army Corps of Engineers, in processing the Pyramid application, simply adopted the analyses of the environmental impact submitted by the applicant and the determinations of the State DEC, the administrative record compels rejection of that claim.

In conjunction with the review of Pyramid's application, three Corps officials, a civil engineer, a biologist and a geologist, conducted a two-day site inspection of the project site and the Limberlost property. Subsequent to the site inspection, the Environmental Assessment was prepared. The Assessment included consideration of information provided by the applicant, information developed by the Corps staff, and other information received prior to issuance of the public notice in March of 1979.

The Assessment contained descriptions of the project and the project site and a detailed discussion of both the on- and off-site mitigation proposals. It also included vegetation tables for both sites, photographs of the sites, diagrams of proposed mitigation measures, a list of wildlife species observed on each site, and the environmental assessment matrix used in preparation of the Assessment.

Environmental factors which received consideration included ecology, safety, socio-economic impact, recreational and historical impacts, aesthetics, and the cumulative impact of the project. Reference was also made to the possibility of alternative positioning of the new Mud Creek channel. Along with a consideration of these factors, the Assessment contained Corps recommendations for lessening any adverse environmental impact of the project. Consideration was given to both the project site and Limberlost property.

The previously described Supplement to the Environmental Assessment was prepared after review of the responses to the public notice. In addition to summarizing the comments received from members of the public and from the Fish and Wildlife Service, the Supplemental Assessment addressed the question of the cumulative impact of destruction of the wetlands by the project:

"the cumulative impact of the mall, MUD and Rt 5S projects on the Mohawk River floodplain and wetlands are not considered significant since the acreage of floodplain and wetlands impacted is small ($\pm 100$ acres of floodplain and $\pm 150$ acres of wetlands.) In addition, flood storage capacity of the Pyramid Mall site will be increased and loss of wetlands will be mitigated. Further, the potential exists for additional reduction in impact to wetlands and floodplains resulting from the MUD and 5S projects through project revision and mitigation. In addition, construction and operational impacts of these projects on the remaining wetlands in the vicinity are minor and insignificant."

Corps officials also prepared a post determination disposition form (referred to as

---

**20.** The CEQ Regulation at 40 C.F.R. § 1506.2, entitled "Elimination of duplication with State and local procedures," demonstrates an intent to encourage cooperation, and the Corps' use of, and even to some extent reliance upon, the State DEC findings does not violate NEPA requirements.

Furthermore, the Corps' own regulations at 33 C.F.R. § 320.4(j)(4) provide that:

"in the absence of overriding national factors of the public interest that may be revealed during the processing of the permit application, a permit will generally be issued following receipt of a favorable State determination. . . ."

The Corps regulation makes it clear, however, that permit issuance is still dependent upon compliance with Federal statutes and regulations.

the "findings of fact") for the application file. The form listed the factors considered by the Corps in issuing the permit as conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, recreation, water supply and quality, energy needs, food production and the welfare and needs of the people. This list conforms generally to the list of factors to be considered set forth in the Corps Regulation at 33 C.F.R. § 320.4 entitled "General policies for evaluating permit applications."

Plaintiff claims that along with its failure to properly evaluate the environmental impact of the project, the Corps neglected to develop an adequate administrative record. More specifically, plaintiff contends that the Environmental Assessment and Supplemental Assessment prepared by the Corps are fatally defective.[21] However, plaintiff's allegations both with regard to the propriety of the Corps' threshold determination and the sufficiency of the administrative record are not supported by the evidence before the Court.[22]

While the documents prepared by the Corps may not contain the in-depth analysis plaintiff might wish, neither do they consist entirely of the bald conclusory statements plaintiff alleges. The record shows that the Corps, under the circumstances presented in this case, adequately complied with the NEPA requirements for making a threshold decision as to the significance of the impact, at least insofar as its consideration of the

factors which relate to the significance of the environmental impact of the project.

■ It is clear that the Corps determination of no significant impact resulted largely from a determination that the proposed mitigation measures would successfully avoid environmental injury which could result from loss of the wetlands and floodplains and from the rechannelization of Mud Creek.[23] This Court is not empowered to substitute its judgment as to the effectiveness of the mitigation measures for that of the Corps. See *Cross-Sound Ferry Services, Inc. v. United States, supra,* at 730.

The Court concedes that the Corps threshold determination could reasonably be disputed. Nonetheless, the record shows that the Corps did consider the relevant environmental data in reaching the decision, that the determination is supported by substantial evidence, and that Corps officials did not act in an arbitrary or capricious manner in abuse of their discretion, nor in violation of the law.

*Alternatives*

■ Plaintiff asserts that the Corps failed to adequately address the issue of alternatives in processing Pyramid's Section 404 Application.[24]

The findings of fact prepared by the Corps on the Pyramid application, contain a statement that there was no need to consider alternatives to the Pyramid proposal because the environmental impact of the

**21.** Although plaintiff relies on the requirements of proposed regulation 33 C.F.R. § 230.8, 44 F.R. 38295, the Corps was not bound by it since it is not a final regulation.

**22.** The Court recognizes that the Corps failed to prepare a Finding of No Significant Impact (FONSI) as required by NEPA Regulations at 40 C.F.R. § 1508.13, which became effective *during the processing of this action,* but does not find that failure adequate cause for finding the administrative record insufficient in this case.

**23.** The potential affect of the project on wetlands and floodplains is particularly important in this case. See Executive Orders Nos. 11988 and 11990, *supra,* and 33 C.F.R. § 320.4(b)(1) which provides in part that:

"wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."

The Court is convinced that the Corps gave special consideration to the impact on the wetlands through its in-depth review of the proposed mitigation measures and consideration of cumulative effect.

**24.** The Court intentionally avoided addressing the issue of alternatives in its discussion of the Corps threshold decision. Although well aware of the Corps' obligation to investigate alternatives even though a finding of no significant impact is made, the Court does not believe that the failure to do so in this case fatally taints the Corps determination of no significant impact.

project would be insignificant. That assumption, however, is incorrect as the Corps has an affirmative obligation to consider alternatives to a proposal, which exists independent of any duty it might have to file an EIS. *Hanly II, supra,* at 834; *Trinity Episcopal School Corporation v. Romney, supra,* at 93.

This obligation arises out of 42 U.S.C. § 4332(2)(E) which states that all Federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

Compliance with the requirement must be judged against a rule of reason. *East 63rd Street Ass'n. v. Coleman, supra,* 414 F.Supp. 1326. Thus, in this instance, in light of the availability of materials on alternatives from Pyramid and the comprehensive review of the project and possible alternatives by the State DEC, the Corps obligation to independently investigate alternatives could reasonably be found to be much less substantial than might otherwise be the case.

■ However, even applying the rule of reason, absolute reliance on the Pyramid material and DEC findings, without additional independent analysis, cannot satisfy the requirement. *Trinity Episcopal School Corporation v. Romney, supra,* at 94. See also *City of New Haven v. Chandler,* 446 F.Supp. 925, 934 (D.Conn.1978). Nor does the cursory statement in the Supplemental Assessment indicating that the applicant has adequately evaluated the alternatives satisfy the obligation as defendant Pyramid suggests.

Failing to find sufficient evidence of the required independent analysis of alternatives in the administrative record, the Court must agree with plaintiff's contention with regard to the Corps' failure to adequately consider alternatives.

*Fish and Wildlife Coordination Act*

■ Pursuant to the Fish and Wildlife Coordination Act, §§ 661 *et seq.,* the Army Corps of Engineers is obligated to consult with the Fish and Wildlife Service concerning the impact on fish and wildlife resources of issuance of a Section 404 permit. See *Zabel v. Tabb,* 430 F.2d 199, 209 (5th Cir. 1970). Plaintiff contends that the Corps failed to comply with the Act in issuance of the permit to Pyramid.

There is no question but that Fish and Wildlife Service officials were opposed to issuance of the permit to Pyramid, without certain modification of the project proposed by the Service.[25] The proposed modifications involved changes which would dispense with the need for the rechannelization of Mud Creek. Pyramid, given the opportunity to respond to the Fish and Wildlife Service position as required under 33 C.F.R. § 325.2(a)(3), found the proposed modifications economically unfeasible.

The Fish and Wildlife Service did not change its position prior to the Corps decision to issue the permit but did refuse the opportunity to seek higher review of the decision to issue the permit.[26] Plaintiff argues that issuance of the permit over the unresolved objection of the Fish and Wildlife Service violated the Fish and Wildlife Coordination Act, as well as the Corps' own

**25.** The Fish and Wildlife Service, in its initial response to the public notice, took the position that the project constituted a major Federal action significantly affecting the environment, thereby requiring preparation of an EIS. There is some indication that the request for an EIS was made as a negotiating ploy to force adoption of the modification proposals made by Fish and Wildlife. It is clear, however, that the Service wanted either an EIS or the modifications and did not favor the project as proposed.

**26.** Prior to issuance of the permit, a Corps official wrote to the Fish and Wildlife Service

indicating that although it was unusual to issue a permit over the objection of another Federal agency, that in this instance the Corps believed that issuance was in the public interest. Fish and Wildlife was informed in that letter of its right to seek higher review.

33 C.F.R. § 3258(b) provides in part that: "District Engineers may. issue permits over an unresolved objection of another Federal agency if that agency indicates that it does not desire to refer the application to a higher level of authority for review."

Regulation which required it to give "great weight" to the views of the Fish and Wildlife Service concerning fish and wildlife conservation.

Plaintiff fails to recognize, however, that the final decision rested with the Corps, which had to base its determination not only on the impact of the project on fish and wildlife but on a "careful weighing of all those factors which become relevant in each particular case . . . . The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

The Fish and Wildlife Coordination Act does not require that the Corps decision always correspond to the views of the Fish and Wildlife Service. Rather the Act requires that the views be given serious consideration, and there is nothing in the Corps record which shows that the Corps failed to do so.

*Public Notice and Hearing Requirements Under NEPA*

■ Plaintiff claims that even if the Army Corps of Engineers' finding of no significant impact was correct, the Corps officials violated the public notice requirements under NEPA.

The Second Circuit, in *Hanly II, supra,* stated that:

"before a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision." 471 F.2d at 836.

See also *WATCH (Waterbury Action, etc.) v. Harris,* 603 F.2d 310, 326, n.36 (2d Cir. 1979); 33 C.F.R. § 325.3; Executive Orders Nos. 11988 and 11990, *supra.*

Public Notice of the Pyramid application was issued on March 8, 1979, to each of the Federal agencies interested in the determination; to neighboring landowners whose names appeared on a list submitted to the Corps by Pyramid in accordance with Corps Regulations; Federal Senators and Congressmen representing the district involved; local officials; the New Hartford Postmaster and the parties listed on Corps computer print out list number 41.

List number 41 is designated for the Hudson River (Poughkeepsie to Troy) and is used by the New York District of the Corps for projects in areas which contain waterways which drain into the Hudson. The Corps includes the City of Utica in this area. List 41 is a list compiled by the Corps identifying organizations, businesses and publications known by the Corps to have an interest in Corps action in the described geographical area. The Corps has no specific list for waterways emptying into the Mohawk River.[27] List number 41 does not contain the names of newspapers or interested organizations and individuals in the Utica-New Hartford area, but lists, for example, newspapers published in Newburgh, Saugerties, Pleasantville, Troy, and Hudson, New York.

Plaintiff contends that this list was improperly used since it does not serve to assure notice to concerned individuals and organizations in the Utica-New Hartford area. The Court agrees that utilization of list number 41 did not provide the type of notice envisioned under NEPA, either as provided in *Hanly II* or in the Corps' own Regulations.[28]

Aside from the utilization of list number 41, however, the Corps complied adequately with the NEPA public notice mandates. Furthermore, even though the Corps may not have used the proper list for public notice of the application, the purpose of the notice requirements has been satisfied in this case.

The primary reason for issuance of public notice by Federal agencies is to "involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). A Corps decision on permit issuance must be

---

27. As previously noted, Mud Creek is a tributary of the Saquoit River. The Saquoit flows into the Mohawk River.

28. See 33 C.F.R. § 325.3.

based, in part, on the effect of "its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). The Corps Regulation further provides that "no permit will be granted unless its issuance is found to be in the public interest." *Id.* Public input is, of course, essential so that the Corps can utilize the input in making its own determination as to the public interest.

The Corps in this case received several letters from area property owners which contained generally the same objections raised by plaintiff. Corps officials were also made aware of the concerns of the Fish and Wildlife Service, which were similar, if not identical to those of the plaintiff. Finally, Corps officials, through review of the State DEC hearing report, became familiar with plaintiff's views on the project, since plaintiff along with numerous other environmental interest groups, was a party to those hearings.

Therefore, it is clear that the Corps had been made aware of the concerns of the public prior to issuance of the permit. While that fact certainly does not justify the Corps' failure to provide notice in strict compliance with NEPA requirements, it is important insofar as determining how that failure should be dealt with by the Court.

█ Plaintiff also argues that in light of the strong public interest in the Pyramid project, public hearings should have been held on the permit application. The Court disagrees.

A Federal agency is not required to conduct public hearings before making a threshold determination as to the need for an EIS so long as members of the public are given the opportunity to submit facts which might bear upon the agency decision. *WATCH (Waterbury Action, etc.) v. Harris, supra,* at 326, n.36. See also 33 C.F.R. § 327.4(a) & (b) setting forth Corps policy on public hearings.

The Corps received no requests for public hearings in response to the public notice although the notice clearly advised recipients of the right to do so. Furthermore, in light of the extensive public hearings held by the State DEC in March and April of 1979, any hearings held by the Corps would have been duplicative.

*Plaintiff's Request for Injunctive Relief*

As previously explained, plaintiff's motion for a preliminary injunction has been consolidated with a full trial on the merits for a permanent injunction. The standard in the Second Circuit for issuance of a preliminary injunction is that:

"there must be a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly towards the party requesting the preliminary relief." *Buffalo Courier-Express, Inc. v. Buffalo Evening News,* 601 F.2d 48, 54 (2d Cir. 1979), quoting from *Caulfield v. Board of Education of City of New York,* 583 F.2d 605, 610 (2d Cir. 1978).

█ In deciding whether a permanent injunction should be issued, the Court must first determine if plaintiff has actually succeeded on the merits. If so, the Court must then decide whether the "balance of equities" favor injunctive relief, and if so, what form it should take. See *Galella v. Onassis,* 353 F.Supp. 196, 235 (S.D.N.Y.1972), aff'd. in part and rev'd. in part on other gnds., 487 F.2d 986 (2d Cir. 1973); *Minnesota Public Interest Research Group v. Butz,* 358 F.Supp. 584 (D.Minn.1973), aff'd. 498 F.2d 1314 (8th Cir. 1974).

█ Defendants contend that even if the Court finds that the Corps failed to comply with NEPA requirements in this action, that issuance of injunctive relief pending compliance should be barred under the doctrine of laches. The doctrine of laches, while rarely invoked in environmental cases because of the public interest in compliance with NEPA, is available as a defense when the facts of the case call for its application. See *City of Rochester v. United States Postal Service,* 541 F.2d 967 (2d Cir. 1976); *Dalsis v. Hills,* 424 F.Supp. 784 (W.D.N.Y.1976).

In order to prevail in a laches defense, defendants must show that plaintiff unreasonably delayed in commencing this action with resulting prejudice to defendants. *East 63rd Street Ass'n. v. Coleman, supra,* at 1330. Even then, "the primary question is not how much earlier plaintiff should have sued, but whether injunctive relief pending compliance would still serve the public interest and the purposes of the Act." *Steubing v. Brinegar, supra,* 511 F.2d at 495. Although defendants are not entitled to dismissal of the complaint on laches grounds, it is the opinion of the Court that issuance of an injunction at this point would neither be in the public interest nor would such relief serve the purposes of NEPA.

The Second Circuit, in *Conservation Soc. of S. Ver., Inc. v. Secretary of Tran.,* 508 F.2d 927, 933–34 (2d Cir. 1974), vacated and remanded on other gnds., 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975) stated that:

> although the procedural requirements of NEPA must be followed scrupulously and cost or delay will not alone justify noncompliance with the Act, where the equities require, it remains within the sound discretion of a district court to decline an injunction even where deviations from prescribed NEPA procedures have occurred."

See also *State of New York v. Nuclear Reg. Com'n.* 550 F.2d 745, 753 (2d Cir. 1977).

The Court has found that the Corps failed to strictly comply with the NEPA requirements concerning the study of alternatives and the issuance of public notice, and is, as a result, empowered to enjoin work on the mall pending compliance. However, for the following two reasons, the Court finds such relief inappropriate.

First, even with the Corps' failure to comply, the purposes of NEPA have been satisfied. Although the Corps did not conduct the required independent analysis of alternatives, the possible alternatives to the project did receive ample consideration. The materials submitted by Pyramid contained an investigation of alternatives, and the issue was thoroughly addressed at the State DEC hearings. Furthermore, plaintiff has not during the course of this action, suggested any alternatives to the project which have not previously been considered. Enjoining construction so that the Corps could go back and conduct a review of alternatives which would in all likelihood amount to a duplication of effort previously expended and would serve no purpose beyond delaying construction of the mall. With regard to public notice, the Court has already explained that although the Corps should have sent the notice to newspapers and organizations in the geographical proximity of the project site, the failure to do so did not deprive the Corps of an awareness of the concerns of individuals residing near the project site or even of the views of the plaintiff which through the State DEC hearing report were before the Corps when its decision was made.

Second, and perhaps more importantly, the weight of the evidence before the Court concerning the condition of the project site at the time this action was commenced and through the trial on the merits, supports the conclusion that enjoining work on the site at this time would be likely to have a more detrimental impact on the environment than allowing work to continue through to completion as planned.

Although in both its complaint and affidavit in support of its motion for a preliminary injunction, plaintiff alleges that only a minimal amount of work had been undertaken on the mall project at the time the action was commenced, that was clearly not the case. Work on the site was commenced immediately after issuance of the Section 404 permit and has continued at a constant, rapid pace since that time.

By the time this action was commenced, the area had been virtually cleared of vegetation and earth moving equipment had been engaged in site work for close to a month. The new channel for Mud Creek had been completed and rechannelization took place shortly after commencement of the action.

Testimony elicited both at a hearing held on plaintiff's request for a temporary re-

straining order on November 29, 1979,[29] and at the trial on the merits, supports the conclusion that at this point it would be potentially more harmful to the environment to stop work on the site than to allow continuation. In addition, a representative of the Fish and Wildlife Service testified that if, as site pictures indicated, most of the vegetation had already been removed, then the damage to fish and wildlife would be virtually complete and injunctive relief would no longer serve any purpose so far as protection of fish and wildlife was concerned.

Even those witnesses who expressed the opinion that the site could be restored to its former state if construction was stopped, admitted that serious environmental problems would occur if the soil was not immediately stabilized.[30] According to a Corps witness, stabilization would involve either doing plantings on the site, which would be impossible this time of year or placing material such as straw or plastic on the site to protect the soil from rain and erosion. This method in the witness' opinion would be inadequate because the winds would quickly destroy the covering and once blown away, the material would end up clogging waterways.

Furthermore, plaintiff's request that the Court order defendant Pyramid to do the work necessary to return the site to its former state is absolutely unwarranted at this time, since even if injunctive relief had been warranted, it would only be ordered in this case to maintain the status quo pending compliance by the Corps with NEPA requirements. Since it has been demonstrated that maintenance of the status quo could be environmentally disastrous at this time, the public interest clearly militates against granting such relief.

It is Therefore, Ordered, Adjudged and Decreed:

1. That the Army Corps of Engineers defendants violated NEPA at 42 U.S.C. § 4332(2)(E), in failing to adequately consider alternatives to the Pyramid Mall proposal in making a threshold decision on defendant Pyramid's application for a Section 404 permit.

2. That the Army Corps of Engineers defendants failed to provide adequate public notice of defendant Pyramid's application for a Section 404 permit, in violation of NEPA requirements and in violation of the Army Corps of Engineers Regulations implementing permit programs at 33 C.F.R. § 325.3.

3. That the Army Corps of Engineers defendants complied in all other respects with applicable Federal statutes, regulations and executive orders in the issuance of a Section 404 permit to defendant Pyramid for the shopping center mall project, and plaintiff's request for declaratory relief beyond that previously granted is denied.

---

**29.** Plaintiff first requested issuance of a temporary restraining order on the same day as the complaint in this action was filed. The Court heard argument on the request with counsel for all parties present. The request was denied and a hearing on the plaintiff's preliminary injunction motion was set for December 3, 1979.

However, the matter was before the Court again on November 29, 1979, when a hearing was held on plaintiff's request for reconsideration of its request for temporary injunctive relief. Plaintiff requested the reconsideration in light of allegations made by it that defendant Pyramid was attempting to rob the Court of its jurisdiction by acceleration of the work schedule on the site and by the rechannelization of Mud Creek prior to the hearing on the preliminary injunction.

Testimony at the hearing contradicted plaintiff's claims and the request was again denied.

Defendant Pyramid's request for an award of excess costs pursuant to 28 U.S.C. § 1927 was likewise denied both after the hearing and again at the trial on the merits.

Prior to the commencement of the November 29, 1979, hearing counsel for all parties were advised that the testimony at the hearing would be considered by the Court in its decision on the merits of this action.

**30.** A plant biochemist from Cornell University testified that he believed that the physical characteristics necessary for restoration of the wetlands were still present on the project site. However, in his testimony, the witness admitted that he did not believe that he had been allowed sufficient time to study the project and the site and described his study as cursory and perhaps inadequate.

4. That neither preliminary nor permanent injunctive relief is warranted in this action, and plaintiff's request for such relief is denied.

5. That plaintiff's request for attorney's fees and expert witness fees is denied.

6. That in view of the equities and public interest involved in this action, each party shall be required to bear its own costs.